UNITED STATES of America, Plaintiff,

v.

ARTICLES OF DRUG, Consisting of: 203 paper bags, more or less, et al., Defendant.

No. 84 C 7677.

United States District Court, N.D. Illinois, E.D.

May 30, 1985.

On Motion for Re-Exportation Feb. 28, 1986.

On Motion for Stay of Execution March 14, 1986.

Michael S. O'Connell, Asst. U.S. Atty., U.S. Atty's. Office, Chicago, Ill., Richard E. Geyer (GCF–1), Office of the Gen. Counsel, Food and Drug Admin., Rockville, Md., for plaintiff.

Sheryl A. Marcouiller, Alan I. Becker, George M. Burditt, Burditt, Bowles & Rad- zius, Ltd., Chicago, Ill., for Claimant Amexchem Intern., Inc.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

This action is before the court on motion of Amexchem International, Inc. ("Amexchem"), the claimant of the articles seized in this case, for exportation in lieu of destruction. For the reasons set forth below, this court must defer ruling pending further hearings.

Twelve shipments of animal drugs imported by Amexchem were seized by the Food and Drug Administration ("FDA"). The drugs have been condemned by consent decree as being adulterated under section 501(a)(5) of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 351(a)(5), because they are unapproved new animal drugs. Most of the lots have also been condemned as misbranded under either section 502(c) or 502(f)(1) of the FDCA, 21 U.S.C. §§ 352(c) or 352(f)(1), or both. The sole issue before the court is whether Amexchem may reexport these condemned drugs under § 304(d)(1), 21 U.S.C. § 334(d)(1), or whether they may be destroyed by the FDA.

Section 304(d)(1) provides for the disposition of any "food, drug, device or cosmetic" condemned under the section. It specifically provides for the reexportation of imported articles as follows:

If the article was imported into the United States and the person seeking its release establishes (A) that the adulteration, misbranding, or violation did not occur after the article was imported, and (B) that he had no cause for believing that it was adulterated, misbranded, or in violation before it was released from customs custody, the court may permit the article to be delivered to the owner for exportation in lieu of destruction upon a showing by the owner that all of the conditions of section 381(d) of this title can and will be met: *Provided, however,* That the provisions of this sentence shall

not apply where condemnation is based upon violation of section 342(a)(1), (2), or (6), section 351(a)(3), section 352(j), or section 361a) or (d) of this title: *And provided further,* That where such exportation is made to the original foreign supplier, then clauses (1) and (2) of section 381(3) of this title and the foregoing proviso shall not be applicable; and in all cases of exportation the bond shall be conditioned that the article shall not be sold or disposed of until the applicable conditions of section 381(d) of this title have been met. Any article condemned by reason of its being an article which may not, under section 344 or 355 of this title, be introduced into interstate commerce, shall be disposed of by destruction.

Thus, Amexchem must establish that (1) the adulteration, misbranding or violation occurred before the article was imported; (2) that Amexchem had no cause to believe the article was adulterated, misbranded or in violation before it was released from customs, and (3) that it can comply with the conditions section 801(d)(1) of the Act, 21 U.S.C. § 381(d)(1), unless the articles will be returned to the original suppliers, in which case it need not comply with section 801(d)(1) and (2), 21 U.S.C. § 381(d)(1)(A) and (B).[1]

■ Amexchem asserts that it can establish all three of these requirements, and requests the court to exercise its discretion under section 304(d) to permit reexportation. The FDA raises a number of arguments against reexportation, and instead requests the court to authorize destruction of the seized drugs. First, the FDA argues that unapproved new animal drugs that have been imported, seized and condemned cannot be reexported under section 304(d) as a matter of law. FDA relies on the sentence in section 801(d)(1), which

---

1. Section 304, as last amended in 1957, states that section 801(d)(1) and (2) need not be complied with if the goods will be reexported to the original foreign supplier. At the time, section 801(d) provided:

(d) A food, drug, device, or cosmetic intended for export shall not be deemed to be adulterated or misbranded under this chapter if it (1) accords to the specifications of the foreign purchaser, (2) is not in conflict with the laws of the country to which it is intended for export, and (3) is labeled on the outside of the shipping package to show that it is intended for export. But if such article is sold or offered for sale in domestic commerce, this subsection shall not exempt it from any of the provisions of this chapter. Nothing in this subsection shall authorize the exportation of any new animal drug, or an animal feed bearing or containing a new animal drug, which is unsafe within the meaning of section 360b of this title.

In 1976, section 801(d) was amended. The substance of the original paragraph was renumbered and incorporated into section 801(d)(1), and a new subparagraph (2) was added as follows:

(d) Exports
(1) A food, drug, device, or cosmetic intended for export shall not be deemed to be adulterated or misbranded under this chapter if it—
(A) accords to the specifications of the foreign purchaser,
(B) is not in conflict with the laws of the country to which it is intended for export,

(C) is labeled on the outside of the shipping package that it is intended for export, and
(D) is not sold or offered for sale in domestic commerce.

This paragraph does not authorize the exportation of any new animal drug, or an animal feed bearing or containing a new animal drug, which is unsafe within the meaning of section 360b of this title.
(2) Paragraph (1) does not apply to any device—
(A) which does not comply with an applicable requirement of section 360b or 360e of this title,
(B) which under section 360j(g) of this title is exempt from either such section, or
(C) which is a banned device under section 360f of this title, unless, in addition to the requirements of paragraph (1), the Secretary has determined that the exportation of the device is not contrary to public health and safety and has the approval of the country to which it is intended for export.

Section 304 was not amended to reflect this change. Nevertheless, it appears that Congress, in amending section 801(d), did not intend to change the substantive requirements of section 304. The court will therefore interpret section 304 as exempting exporters sending goods back to the original foreign supplier from compliance with the renumbered, amended section 801(d)(1)(A) and (B), and not to exempt them entirely from compliance with all the requirements of the amended section 801(d)(1) and (2).

states, "This paragraph does not authorize the exportation of any new animal drug, or an animal feed bearing or containing a new animal drug, which is unsafe within the meaning of section 360b of this title." [2] The FDA asserts that, since section 304(d)(1) requires compliance with section 801(d)(1), this sentence in section 801(d)(1) prohibits reexportation of the seized new animal drugs of Amexchem under section 304(d)(1).

However, the FDA's interpretation ignores the specific language of these provisions and the legislative intent of Congress. The last sentence of section 801(d) states that *"this paragraph"* (emphasis added) does not authorize the export of new animal drugs. It does not prohibit export authorized by other paragraphs, such as section 304(d)(1). In addition, section 304(d)(1) permits export of articles that are "adulterated, misbranded, or *in violation*" (emphasis added). If a drug is not adulterated or misbranded, the only way it can violate the FDCA is by being new and unapproved. Thus, by including "violative" drugs, Congress seems to have contemplated the export of new unapproved drugs.

Moreover, if Congress intended to impose any additional requirements on export or bar the export of any particular products, it could have done so expressly when amending section 304(d)(1). Congress did in fact specify in the amendment to section 304(d)(1) products which it would not permit to be exported under section 304(d)(1). A proviso to the export provision of section 304(d)(1) expressly states that, if goods are condemned under any of the sections of the Act specifically listed, they cannot be exported under section 304(d)(1). Each of the sections listed concerns substances dangerous to health. Congress therefore expressly specified the types of goods which could not be exported because of their dangerous nature. If Congress intended to prohibit the export of new animal drugs under sec-

tion 304(d)(1), it could have included section 501(a)(5), 21 U.S.C. § 351(a)(5), the section governing new drugs, in that proviso. By not including section 501(a)(5), under the well-established principle of *expressio unius est exclusio alterius,* Congress evidenced an intent that new drugs not be subject to any special prohibition from the export privilege created by the amendment to section 304(d)(1).

This interpretation is consistent with the legislative history of section 304(d)(1) and reflects Congress' intent in amending this provision. Since the original enactment of the FDCA in 1938, section 801(a) has given importers the unqualified right to reexport imported drugs if a failure to comply with U.S. requirements is discovered at the point of entry before the drugs are released by customs. 21 U.S.C. § 381(a). However, the 1938 Act had no equivalent provision permitting reexport of violative drugs which were for some reason released into commerce before the violation was discovered. If the articles were seized after they were released, section 304 required their destruction unless the drugs could be brought into compliance with the Act. This resulted in unequal treatment of importers, with the right to reexport dependent upon whether the violation of U.S. drug law was discovered before or after the drugs were released from customs. The ability to reexport therefore often depended upon the imperfect and highly variable screening process at the point of entry.

In apparent response to this perceived inequity, Congress amended the FDCA in 1957 to permit the reexport of imported drugs which violate the FDCA if the conditions specified above could be met. Testimony at legislative hearings in the amendment indicates that the purpose of the bill was to apply the same reexport procedure whether the merchandise is seized at the point of entry or at some later time. *Amendments to Federal Food, Drug, and*

---

**2.** Section 801(d) governs the export of domestically manufactured articles covered by the Act, it does not itself apply to imported goods. Therefore, the sentence referred to by FDA prohibits the export of domestically manufactured new animal drugs, not imported new animal drugs.

*Cosmetic Act. Hearings on H.R. 10519 Before the Subcommittee on Health and Science of the House Committee on Interstate and Foreign Commerce* ("Hearings"), 84th Cong., 2d Sess. 27–33, 39–43 (1956) (statement of Harry S. Radcliffe). The Deputy Commissioner of the Food and Drug Administration interpreted the amendment to section 304 as follows:

This bill seeks to amend section 304(d) of the Federal Food, Drug, and Cosmetic Act in a manner to allow a United States judge to authorize exportation of *seized drugs* or cosmetics, where those goods had originally been imported and their faulty condition was not detected at the port of entry, and they subsequently entered the channels of domestic commerce and later were discovered to have been in violation of the act, and they are seized under domestic sections of the law. It is the settled judicial interpretation now that where such seizures are made, the provision to simply reexport them will not lie.

\* \* \* \* \* \*

This bill seeks to authorize the exportation of such seized goods (1) if the importer or owner proposes simply to send them back to the person he got them from by a simple court order authorizing him to do so under appropriate bond which is exonerated when it is found he has done so.

*Id.* at 39.

From these hearings, it seems that Congress intended the amendments to section 304 to allow the export of goods seized after admission to same extent as section 801(a) allowed the export of goods rejected before admission, except for the additional requirements Congress chose to specifically impose. Thus, Congress presumably chose to permit the virtually unrestricted export allowed under section 801(a), except to the extent it specifically limited that export in section 304(d). The only products not exportable under section 304(d) are those condemned under the provisions specifically listed. There is no basis in the statute itself or the legislative history for

concluding that Congress intended the one sentence in section 801(d) relied on by the FDA, which by its own terms does not purport to preclude export of new animal drugs under any other provisions of the Act, to place an additional restriction on exports under section 304, which is complete in itself. The court therefore finds that the sentence in section 801(d) prohibiting export under that section of domestically produced new animal drugs does not, preclude export of imported new animal drugs, as a matter of law, under section 304.

The FDA next argues that, even if new animal drugs may be reexported as a matter of law, Amexchem cannot meet the requirements of section 304(d)(1). First, the FDA describes the factual circumstances of each of the twelve lots of drugs. It argues that Amexchem cannot meet the requirements of section 304 for each of these lots. However, Amexchem has not responded to this aspect of FDA's memorandum, apparently taking the position that only legal issues should be addressed now, and that these factual matters should be resolved at a later time. The court therefore will not now analyze each lot to determine if the requirements of section 304 can be met.

FDA also makes a second legal argument regarding Amexchem's ability to comply with section 304. It asserts that Amexchem cannot reexport under section 304, because it will not be sending the drugs back to the original foreign manufacturer. As discussed above, for a claimant to reexport under section 304, it must show that it "can and will" meet the requirements of section 801(d)(1), unless it exports to the original foreign supplier. In that case, the claimant need only comply with subsections (C) and (D) of section 801(d)(1), not with subsections (A) and (B).

■ The government argues that "original foreign supplier" means the original manufacturer of the drugs. Amexchem intends to reexport to Chemtraco B.V., in the Netherlands, the broker from which it purchased the drugs. Since these drugs were

not manufactured by Chemtraco, the FDA asserts that it is not the original supplier. It therefore contends that Amexchem must comply with section 801(d)(1)(B), which allows export only if the drug is not in conflict with the laws of the country to which it is intended for export.

The FDA offers no support for its argument that "original foreign supplier" means "original foreign manufacturer." It asserts only that to allow reexport to a broker would defeat this country's policy against "dumping" dangerous or adulterated drugs abroad. However, if Congress had intended to permit reexport only to the original manufacturer, it would have so stated. Instead, it chose the word "supplier," which does not connote that the goods may be sent only to the original creator of the product.

The legislative history of section 304(d)(1) supports this interpretation. As quoted above, the Deputy Commissioner of the FDA stated that the bill sought to authorize the exportation of goods "if the importer or owner proposes only to send them back to the person he got them from . . ." *Hearings, supra,* at 39. In addition, Congressman Dies, in commenting on the bill, also recognized that it was intended to permit the importer to "send it back to the man who sold it." *Id.* at 30–31. Congress therefore intended to permit reexport to the person who sold goods to the importer. No evidence of a Congressional intent to limit export under section 304(d) only to the original manufacturer has been presented. Therefore, under the plain language of the statute, and in the absence of any contrary authority, the court concludes that export is permitted under section 304 to a foreign supplier, such as Chemtraco. Amexchem could therefore export the drugs in question to Chemtraco as the original foreign supplier without complying with section 801(d)(1)(A) and (B).

Since the factual circumstances of each shipment have not been fully presented to the court, it is impossible at this time to apply the facts to the standards set forth in section 304(d) as interpreted above. The court therefore defers making a final determination on whether to permit export of the drugs seized in this case pending further hearing on the matter.

## ON MOTION FOR RE-EXPORTATION

### I. Introduction

These consolidated cases concern twelve lots of drugs intended for use in the manufacture of medicated animal feed, which the United States Government ("Government") seized at the request of the Food and Drug Administration ("FDA"). The motion of claimant, Amexchem, International, Inc. ("Amexchem"), for re-exportation of the drugs in lieu of destruction is presently before the court. The court notes the extreme urgency of this motion, given that the Government seized the drugs in August and September of 1984, and the drugs are rapidly losing their effectiveness.

The court held a hearing on this motion on June 24–26, July 2–3 and July 12, 1985. The court has reviewed the pleadings and the statutory provisions related to the motion for re-exportation in lieu of destruction, and has heard the opening statements and closing arguments of counsel and the testimony of witnesses. The court has considered all the evidence presented and has drawn what it concludes to be the correct reasonable inferences from this evidence. The court has also evaluated the legal arguments presented by the parties. In judging the credibility of each witness and the weight to be given the testimony of each, the court has taken into account for each witness the intelligence, the ability and opportunity to observe, the age, the memory, the manner while testifying, any interest, bias, or prejudice the witness may have, and the reasonableness of the testimony considered in the light of all the evidence in the case. The court has reviewed its extensive hearing notes, including its references concerning the credibility of witnesses and the conclusions drawn from the evidence. Based on all the evidence and legal arguments presented, and for the reasons set forth below, the court

grants Amexchem's motion for exportation in lieu of destruction, making the following findings of fact and conclusions of law.

## II. Facts

Amexchem is the importer and claimant of the twelve seized shipments which are the subject of this proceeding. Heinz Dall is the President of Amexchem.

In 1982, Amexchem began importing trace minerals and vitamins for resale to animal feed manufacturers. Several of Amexchem's customers requested Amexchem to also import certain drugs used in animal feed. Dall Aff. ¶ 4. These animal feed manufacturers wanted to purchase imported drugs of the same type as sold domestically at lower prices than were available in the United States. Dall Aff. ¶ 4, Dall, Hospodka, Hasiak, Adkins, and Lane Hearing Testimony. In answer to this request, Amexchem began importing certain drugs used in animal feed from Chemtraco B.V., a brokerage house in the Netherlands.

The twelve shipments of drugs involved in this action are as follows: (1) Oxytetracyline 262, 67, 53, 120, 779 and 80; (2) Terramycin 167 and 154; (3) Tylosin 203; (4) Flavomycin 40 and 200; and (5) Elancoban 40.[1] The court will now examine the particular facts and circumstances surrounding each imported and seized animal drug.

### A. Oxytetracyline 262, 67, 53, 120, 779 and 80

V.P.O., Inc. ("V.P.O."), of Omaha, Nebraska, is a manufacturer of animal feed and one of Amexchem's customers. In late 1982, William Winstrom, the President of V.P.O., and Dall discussed the possibility of Amexchem supplying V.P.O. with oxytetracycline ("OTC") manufactured in China and Hungary. Dall Aff. ¶ 5. V.P.O. was, and is, authorized to use OTC from those sources. Stipulation at Hearing.

Between December, 1982 and the Spring of 1983, V.P.O. gave Amexchem several

oral orders for OTC, which were followed by written purchase orders. Altogether, V.P.O. ordered a total of 30,000 kilograms of OTC from Amexchem during this period. Dall Aff. ¶¶ 6, 7.

Each of V.P.O.'s Purchase Orders specified a delivery date. From December, 1982 through July, 1983, thirteen shipments of the ordered OTC arrived and were transferred to V.P.O. Sigler Group Exhibit. Some of these shipments arrived in time to meet the purchase order delivery date. However, a large percent of the shipments arrived after the delivery date. Dall Aff. ¶ 8.

In the Spring of 1983, Dall and Winstrom met to discuss the delivery problems encountered during the 1982–1983 season.[2] Winstrom stated that V.P.O. would like to continue to order OTC from Amexchem, because of the comparatively low price and the high quality of the OTC Amexchem imported. However, Winstrom indicated that he was not sure V.P.O. would be able to continue ordering OTC from Amexchem because of Amexchem's chronic failure to meet delivery deadlines. Dall Aff. ¶ 9.

In response to Winstrom's reservations, Dall proposed that Amexchem purchase and import OTC which it could then hold for V.P.O.'s use as needed. Winstrom stated that he would be pleased with such an arrangement. He also stated that, although he could not commit V.P.O. to any specific orders for the 1983–1984 season right then, V.P.O.'s business had increased over the years and he expected V.P.O. to produce at least as much in the 1983–1984 season as it had in the 1982–1983 season. Thus, Amexchem and V.P.O., through Dall and Winstrom, reached an informal understanding that Amexchem would have OTC available for V.P.O. which could be delivered expeditiously, and V.P.O. would place specific orders for OTC as needed. Dall Aff. ¶ 10. Of course, V.P.O.'s prospective purchases of OTC would be contingent on the competitiveness of Amexchem's price,

---

1. The numbers following the names of the drugs refer to the number of bags in the particular shipment.

2. The selling season for animal feed antibiotics runs generally from the Fall through the Spring.

but Amexchem was willing to meet any competitive price. Dall Aff. ¶ 10.

Based on this informal understanding, Amexchem ordered OTC from its supplier, Chemtraco, for V.P.O. On July 21, 1983, Amexchem ordered 60 tons of OTC 10%. Stipulation 8(a). Later that summer, Amexchem ordered 6,325 kilograms of pure (base) OTC. Stipulations 7(a), 10(a), 11(a) and 12(a). According to Dall, this was a conservative quantity when compared to the 30,000 kilograms of OTC V.P.O. ordered in the 1982–1983 season. Dall Aff. ¶ 11.

During the Summer of 1983, Dall spoke with Winstrom frequently concerning V.P. O.'s need for OTC. On each occasion, Winstrom informed Dall that V.P.O. was not yet ready to place a specific order, but asked Dall to keep in touch. Dall Aff. ¶ 12. In October, 1983, Smithkline acquired V.P.O. Winstrom stayed on as a consultant with SmithKline. After the acquisition, Winstrom assured Dall that there was no reason why SmithKline would not continue to do business with Amexchem.[3] Again,

Winstrom expressed that V.P.O. did not at that time need OTC, but V.P.O. would need OTC further into the 1983–1984 season. Dall Aff. ¶ 14.

Beginning in December, 1983 through February, 1984, the OTC Amexchem ordered pursuant to its informal understanding with V.P.O./SmithKline arrived in the United States.[4] Amexchem transferred the OTC shipments to storage warehouses in Iowa in order to avoid the much higher New York warehousing fees and to keep the OTC at a location from which Amexchem would readily deliver the OTC to V.P.O.[5] Once in storage, the six OTC shipments remained in storage until the Government seized the shipments.[6]

In February, 1984, Dall met with James Meier and Richard Smythe of SmithKline. Smythe, a purchasing agent for SmithKline, repeated what Winstrom had told Dall in October, 1983: that there was no reason why SmithKline and Amexchem could not continue the relationship which V.P.O. and Amexchem had established, but that SmithKline currently had a sufficient sup-

---

**3.** In fact, after the acquisition, SmithKline continued to buy tylosin from Amexchem as V.P.O. had done prior to the acquisition. Dall Hearing Testimony.

**4.** The OTC 67 shipment arrived in New York on December 15, 1983; the OTC 53 shipment, on January 24, 1983; the OTC 120 shipment, on February 2, 1984; the OTC 779 shipment, on February 21, 1984; and the OTC 80 shipment, on February 29, 1984. Stipulations 7(b), 8(b), 10(b), 11(b) and 12(b).

The OTC 262 shipment which is also the subject of this proceeding was not ordered pursuant to the informal understanding between V.P.O./SmithKline and Amexchem. Rather, the OTC 262 shipment was part of an order for 15,000 tons of OTC which V.P.O. had placed during February, 1983. Dall Affidavit ¶ 13. V.P.O. attempted to cancel this order in April of 1983. Amexchem, in turn, attempted to cancel its order with Chemtraco, but was unsuccessful. The shipment of OTC 262 arrived in New York on September 2, 1983. Amexchem expected that it would eventually deliver this shipment to V.P.O. Dall Affidavit ¶ 13; Dall Hearing Testimony.

The total amount of OTC in these six seized shipments which arrived between September, 1983 and February, 1984 is approximately 13,000 kilograms. Dall Affidavit ¶ 15.

**5.** Amexchem sent all but one of the OTC shipments directly to storage after the shipments cleared Customs. The OTC 67 shipment arrived at Continental Warehouse in Des Moines, Iowa on December 28, 1983. Stipulation. The OTC 53, 120 and 80 shipments arrived at Continental Warehouse on March 12, 1984. Stipulation. The OTC 779 shipment arrived at White Transfer and Storage, in Fort Dodge, Iowa, on March 5, 1984. Stipulation. Amexchem first sent the OTC 262 shipment, which arrived in New York on September 2, 1983, to Custom Feed Blenders in Iowa for reexport. When Amexchem was unable to promptly reexport the OTC 262 shipment, Amexchem had the shipment transferred, on September 12, 1983, to White Transfer and Storage. Dall Affidavit ¶ 13.

**6.** On June 6, 1984, the State of Iowa issued a stop sale order covering the OTC 67, 53, 120, and 80 shipments at Continental Warehouse. Stipulation. The U.S. Marshal for Des Moines, Iowa seized these shipments on August 3, 1984. Stipulation. On June 7, 1984, the State of Iowa issued a stop sale order covering the OTC 262 and 779 shipments. Stipulation. The U.S. Marshal for Cedar Rapids, Iowa seized these shipments on August 15, 1984. Stipulation.

ply of OTC. Smythe told Dall that SmithKline would purchase OTC from Amexchem when the need arose, if Amexchem's price was competitive. Dall Aff. ¶ 16. As further evidence of SmithKline's willingness to continue business with Amexchem, in early March, 1984, SmithKline solicited a quote from Amexchem for OTC. Again, SmithKline postponed making a purchase because it had an adequate supply of OTC at the time. Dall Hearing Testimony.

Meanwhile, with the approach of the end of the 1983–1984 season, Dall became doubtful that V.P.O. would purchase an amount of OTC equivalent to the amount V.P.O. had purchased in the 1982–1983 season. Therefore, Dall requested Chemtraco to sell in Europe the balance of the OTC yet to be delivered. Dall Aff. ¶ 17; Amexchem Exhibit 2.

The OTC which had been delivered remained, unaltered and unopened, in warehouses. Dall Aff. ¶ 21; Stipulations 7(f)–(i), 8(d)–(f), 10(d)–(h), 11(f)–(h), 12(d)–(h). Amexchem did not attempt to sell the delivered OTC to any manufacturer in the United States except V.P.O./SmithKline and, on one occasion, Pfizer.[7] Dall Aff. ¶ 18. Pfizer, a manufacturer of OTC itself, was not interested in purchasing the OTC from Amexchem. As outlined earlier, V.P.O./SmithKline continued to express interest in purchasing the OTC from Amexchem through the Spring of 1984. It was not until November, 1984, long after U.S. Marshals had seized the six shipments, that SmithKline, for the first time, informed Amexchem that it would not purchase the OTC under any circumstances. Dall Aff. ¶ 19.

### B. Terramycin 167 and 154

In December, 1983, Amexchem ordered Pfizer terramycin from Oberdale, Ltd., an affiliate of Chemtraco also located in the Netherlands. Amexchem intended to sell the terramycin to Custom Feed Blenders in Iowa.

Amexchem received a telex from Oberdale on December 19, 1983, in which Oberdale stated that it would ship Pfizer terramycin with Italian labels. Dall Aff. ¶ 24; Amexchem Exhibit 6; Stipulation 5(a). Amexchem immediately responded, notifying Oberdale that Italian labels would not be acceptable and that Amexchem required terramycin manufactured in the United States with English labels.[8] On December 27, 1983, Oberdale sent another telex to Amexchem apologizing for the error and confirming that the terramycin would be "U.S." Dall Aff. ¶ 25; Amexchem Exhibit 7; Stipulation 5(a).

The first shipment of terramycin, the terramycin 167 shipment, arrived in New York on February 21, 1984. Stipulation 5(b). The FDA issued a "may proceed" notice for this shipment on February 27, 1984.[9] The shipment arrived at Amexchem

---

7. Both V.P.O./SmithKline and Pfizer were authorized to purchase and use OTC in the United States. Dall Affidavit ¶ 20. On several occasions, Dall made a point of informing the FDA of Amexchem's efforts in selling the OTC. On October 5, 1983, Dall wrote the FDA, stating that if he could not find a customer for the OTC 262 shipment, and another OTC shipment not involved in this proceeding, within two weeks, he would reexport the shipments. Government Exhibit 1210. In a letter dated January 4, 1984, Dall wrote the FDA that he planned to sell the OTC 67 shipment to V.P.O. or Pfizer within ninety days. Government Exhibit 314. On January 23, 1984, Dall wrote the FDA that he was negotiating with both V.P.O. and Pfizer in Canada with regard to the OTC 262, 53 and 120 shipments. Government Exhibits 1217, 494. Finally, in a letter dated March 16, 1984, Dall informed the FDA that V.P.O./SmithKline was scheduled to take over the OTC 80 shipment during that month. Government Exhibit 565.

8. Under 21 U.S.C. § 352(c), drugs are misbranded, and therefore subject to seizure, if their labels are not in English.

9. At the hearing Kenneth M. Klein described the FDA's procedures concerning the importation of animal drugs. When a product which falls under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., enters the United States, the customs broker importing the drug presents a "700 set" to the FDA, along with a broker's folder containing a commercial invoice and an immediate delivery application, and possibly a special customs entry form and a marine bill of lading. A "700 set" consists of 3 forms: (1) form 701, a yellow header sheet; (2) form 702, the green "may proceed" notice; and (3) form 703, a white broker's copy.

on or about March 2, 1984. Amexchem Exhibit 8. From March 2–6, 1984, Dall, who personally checks Amexchem's imports for proper labeling, was out of Amexchem's office. By the time Dall returned, the terramycin 167 shipment had already been sent to Custom Feed Blenders in Iowa. Amexchem was therefore unaware of any problems with the shipment prior to its delivery to Custom Feed Blenders. Dall Aff. ¶ 26.

The terramycin 167 shipment arrived at Custom Feed Blenders on March 12, 1984. Stipulation 5(c) and (d). On that date, Custom Feed Blenders called to inform Amexchem that the terramycin had Italian labels. Stipulation 5(a). Prior to this call, Amexchem was completely unaware of any labeling problem with the terramycin. Dall Aff. ¶ 28. Amexchem had expected Oberdale to ship terramycin with English labels, given the exchange of telexes in December, 1983 and previous assurances from, and reliable performance by, Chemtraco, Oberdale's affiliate. Dall Aff. ¶ 29. Upon hearing of the Italian labels, Amexchem directed Custom Feed Blenders to send the terramycin 167 shipment on to White Transfer and Storage.

Amexchem then began to make efforts to find a lawful use for the terramycin. A foreign division of Pfizer, a highly reputable firm, had manufactured the terramycin; the FDA, therefore, did not and could not assert that the terramycin was dangerous or contaminated. Dall Aff. ¶ 47; Hospodka Testimony. Amexchem, in order to cure the labeling defect, attempted to find a manufacturer with the FDA authority to verify the composition of the terramycin and rebag it with proper labels. Dall, Hasiak, Adkins and Hospodka Hearing Testimony. Amexchem tried to find a company holding an FDA "356" authorization to blend certain drugs from high "base" concentrations to lower concentrations.

IMS in Omaha, Nebraska, held a 356 for blending Pfizer terram. On May 15, 1984, Dall telephoned Quentin Hospodka of IMS and asked if IMS would be interested in purchasing the Italian labeled terramycin.[10]

The FDA stamps both the "700 set" and the broker's folder at the customs house or airport. The stamp directs the broker to keep the merchandise in the metropolitan area until the FDA releases the merchandise. The court notes that Amexchem presented highly credible documentary evidence at the hearing that the FDA does not at all, or at least does not consistently, stamp import documents with this notice. Amexchem Exhibits 41, 44, 45 and 46.

The FDA then reviews the "700 set" and decides either to release the merchandise, in which case the FDA issues form 702, the "may proceed" notice, or to sample the merchandise, in which case the FDA issues form 717, a notice of sampling. An FDA sampling involves a review of documents concerning the merchandise, excluding labeling. After sampling the merchandise, the FDA issues form 717 again, but this time noting that it is releasing the merchandise following the sampling, or form 718, a notice of detention. Once the FDA has detained the merchandise, it may then issue form 717, indicating release, or form 772, a notice of refusal.

In the present case, the FDA issued the following notices concerning the seized shipments:

1. Oxytetracycline 262: notice of detention 9/8/83
2. Oxytetracycline 67: notice of detention 12/22/83
3. Oxytetracycline 53: notice of detention 2/23/84
4. Oxytetracycline 120: notice of release 3/27/84
5. Oxytetracycline 779: may proceed notice 2/27/84
6. Oxytetracycline 80: notice of detention 3/9/84
7. Terramycin 167: may proceed notice 2/27/84
8. Terramycin 154: notice of detention 4/4/84
9. Tylosin 203: may proceed notice 12/15/84
10. Flavomycin 40: may proceed notice 3/24/84
11. Flavomycin 200: may proceed notice 9/__/83
12. Elancoban 40: may proceed notice 6/27/83

10. Hospodka's testimony at the hearing directly conflicted with Dall's testimony. According to Hospodka, Dall assured him during the May 15, 1984 telephone call that the terramycin was manufactured by Pfizer in the United States and had English labels and the FDA's approval. When the terramycin arrived at IMS on May 31, 1984, Hospodka further testified, he was surprised to find the Italian labels, and he telephoned Dall to inform him of the labeling problem. Dall then allegedly stated that Amexchem must have sent the wrong material to IMS.

The facts indicate, however, that on June 1, 1984, the day after the terramycin arrived at IMS and the telephone call allegedly took place, an FDA inspector went to IMS to sample the terramycin. McDonald Testimony. At no time did Hospodka mention to the FDA inspector that IMS was unaware of the foreign labeling before the terramycin arrived. In addition, the court found Dall's testimony during the hearing to be credible and persuasive. The court be-

Dall made it clear that the proposed sale would be subject to FDA approval—that Amexchem would not receive payment for, and IMS would not use, the drugs absent FDA approval. Dall Testimony. Hospodka agreed to purchase the terramycin, subject to FDA approval. On May 31, 1984, the terramycin arrived at IMS. Hospodka Testimony.

Dall then made many attempts to secure FDA approval of his plan to "recondition" the terramycin through chemical verification and repackaging. Dall spoke informally with FDA officers in the Brooklyn, New York office about his "reconditioning" plan in the Spring of 1984. On June 12, 1984, Dall formally proposed his plan to James McDonald, a compliance officer in the FDA's Kansas City office. Dall followed his oral proposal with one in writing, per McDonald's request. Dall Testimony; McDonald Deposition Attachments 1 and 2. On July 16, 1984, Dall met with FDA officers in Rockville, Maryland. At this time, the FDA rejected Dall's "reconditioning" plan and informed Dall that it was planning to seize the terramycin. Dall Testimony.

Upon learning of the FDA's decision, Dall immediately removed the terramycin from IMS to a storage warehouse in Chicago. Dall Testimony. Dall then explored the possibility of exporting the terramycin to Canada. Government Exhibits 1034, 1149 and 1150. However, the State of Illinois issued a stop sale order for the terramycin 167 shipment on August 17, 1984, and, on September 27, 1984, the U.S. Marshals in Chicago seized the terramycin 167 shipment. Stipulation.

The terramycin 154 shipment was part of the December, 1983 order along with the terramycin 167 shipment. However, the terramycin 154 shipment did not arrive in New York until March 27, 1984. Stipulation. As set out above, Amexchem did not know of the foreign labeling on the terramycin 167 shipment until March 12, 1984, when Custom Feed Blenders notified Amexchem of the problem. By that time, Chemtraco had already sent the terramycin

154 shipment and Amexchem could no longer verify the labeling on the terramycin 154 shipment. Dall affidavit ¶ 30. On April 5, 1984, Amexchem inspected the shipment at its office, found Italian labels, and immediately changed the shipping instructions to direct the shipment to White Transfer and Storage. Dall Affidavit ¶ 31; Amexchem Exhibit 9; Stipulation 6(d).

At the time Amexchem sent the terramycin 154 shipment to Iowa for storage, Dall was attempting to secure FDA approval of his "reconditioning" plan. Dall hoped to include the terramycin 154 shipment in any approved reconditioning. In a letter dated April 16, 1984, Dall formally notified the FDA of his plan to find an animal feed manufacturer with 356 authorization to blend terramycin, who could chemically verify and repackage the terramycin. Government Exhibit 999. In a July 9, 1984 letter, Dall identified the 356 holder as International Nutrition. Government Exhibit 951. As stated above, the FDA rejected Dall's "reconditioning" plan at the July 16, 1984 meeting.

The terramycin 154 shipment, like the 167 shipment, involved Pfizer terramycin. The FDA does not assert that the terramycin in the 154 or 167 shipment is dangerous or contaminated. The terramycin from both shipments remains unchanged in its original containers. Dall Testimony.

On June 7, 1984, the State of Iowa issued a stop sale order against the terramycin 154 shipment. U.S. Marshals in Cedar Rapids, Iowa, seized this shipment on August 15, 1984.

### C. Tylosin 203

Between June and December of 1983, Amexchem received four shipments of Tylosin from Chemtraco, all of which were manufactured by Eli Lilly in the United States and labeled in English. Dall Affidavit ¶ 36. In October, 1983, Amexchem ordered more tylosin, specifying, as always, that the tylosin was to be manufactured in the United States and labeled in English.

lieves the testimony of Dall concerning Amex-        chem's representations to IMS.

Amexchem intended to sell the tylosin to V.P.O. Dall Affidavit ¶ 33.

The shipment arrived in New York on December 15, 1983. That same day, the FDA issued a "may proceed" notice on the shipment. Stipulations 4(b) and (c). The foreman of the trucking company hired by Amexchem to pick up the tylosin called Amexchem, after the pickup, to inform Amexchem that the labeling was not in English. As it turned out, Eli Lilly's Belgium division had manufactured the tylosin in the 203 shipment, and the labels were in French and Dutch. Dall Affidavit ¶ 34. The shipment was to go directly to V.P.O. During the telephone call, Dall directed the trucking company to divert the tylosin to Continental Warehouse in Des Moines, Iowa. Stipulation 4(a), Amexchem Exhibit 10; Dall Affidavit ¶ 35.

Amexchem was not expecting, and had no reason to expect, foreign made and labeled tylosin, in light of the four previous tylosin shipments and prior conversations with Chemtraco. Dall Affidavit ¶ 36. However, knowing that the FDA did not, and could not, assert that there were any health or safety problems with the tylosin 203 shipment, given that a division of Eli Lilly, a well-respected drug manufacturer, had manufactured the tylosin, Amexchem decided to try to secure FDA approval for "reconditioning" of the tylosin.

International Nutrition had 356 authorization to blend tylosin. In May, 1984, Amexchem contacted International Nutrition, proposing a sale of the foreign labeled tylosin, subject to FDA approval.[11] International Nutrition agreed to purchase the tylosin, but all parties understood that International Nutrition would not pay Amexchem or use the tylosin absent FDA approval. The tylosin 203 shipment arrived at International Nutrition on June 4, 1984.

Meanwhile, Dall attempted to secure FDA approval of his "reconditioning" plan for the tylosin 203 shipment and, as previously mentioned, the terramycin 167 and 154 shipments. In early June, 1984, Dall met with Joseph McCallion of the FDA's Brooklyn, New York office, and informally discussed the "reconditioning" plan. A formal proposal to FDA officer McDonald followed in mid-June. Dall Testimony; Government Exhibit McDonald Attachment 1 and 2. On July 9, 1984, McCallion informed Dall and Reid Adkins of International Nutrition that the Kansas City FDA office would decide whether to approve of the "reconditioning" plan, and, until approval, neither Amexchem nor International Nutrition were to use the tylosin. Government Exhibit McCallion 1. At the July 16, 1984 meeting with the FDA in Rockville, Maryland, the FDA disapproved Amexchem's "reconditioning" plan as to both the tylosin and the terramycin, and indicated that it planned to seize these shipments. Dall Testimony. Amexchem then moved the tylosin from International Nutrition to a storage warehouse in Chicago. Government Exhibit Hasiak Attachment.

Once the tylosin arrived in Chicago, Amexchem looked into the possibility of exporting it to Canada. Government Exhibits 1149, 1150, 1199C.[12] However, on

11. The testimony of Hasiak and Adkins of International Nutrition directly conflicts with Dall's testimony on this point. According to Hasiak and Adkins, when Dall proposed the sale of the tylosin, he failed to mention the foreign labeling. However, the facts indicate that on June 5, 1984, one day after the Tylosin 204 shipment arrived at International Nutrition, an FDA officer from the Omaha, Nebraska office inspected the tylosin 203 shipment at International Nutrition. At no time did any International Nutrition employee inform the FDA officer that International Nutrition did not know of the foreign labeling before the product arrived. In addition, although a June 1, 1984 letter from Dall to Hasiak does not expressly mention the foreign labeling, it does lay out Dall's plan to "recondition" the tylosin 203 shipment through a 356 authorized blender. Government Exhibit 1128. Such a plan would have been unnecessary had the tylosin been manufactured in the United States with English labeling.

12. Government Exhibit 1149 is a July 27, 1984 letter from Dall to Schmids, a customs broker; Exhibit 1150 is a July 30, 1984 letter from Schmids to Customs; and Exhibit 1199C is an August 1, 1984 letter from Dall to the FDA. All of these documents mistakenly refer to the tylosin 203 shipment as the tylosin 200 shipment. There was a tylosin 200 shipment which arrived in the United States after the tylosin 203 ship-

August 17, 1984, the State of Illinois issued a stop sale order on the tylosin, and on September 27, 1984 United States Marshals in Chicago seized the tylosin 203 shipment. Stipulation.

### D. Flavomycin 40 and 200

In early 1983, Dall discussed importing flavomycin with Albert Lane of Lane Agri. Lane Agri, until that time, had purchased only minerals from Amexchem and had apparently purchased flavomycin from another importer. Stipulation 1(d).

All flavomycin is manufactured outside of the United States, and flavomycin manufactured by Hoechst, a West German company, is approved for use in the United States. Dall Affidavit ¶ 37. American Hoechst, a subsidiary of Hoechst in West Germany, imports 4% flavomycin, which it then blends to a 2.2% concentration level for resale in the United States. Lane Hearing Testimony.

In their discussions regarding the importation of flavomycin, Dall and Lane discussed the requirement of English labeling, but not concentration levels.[13] Dall assumed that all Hoechst flavomycin came in one concentration level, 4%, and that the flavomycin Lane Agri had previously purchased had been at that level. Dall Affidavit ¶ 38; Dall Hearing Testimony. In fact, Lane Agri had only purchased and used 2.2% flavomycin, but Dall was unaware of this fact. Lane and Dall Hearing Testimony.

Based on his discussions with Lane, Dall ordered flavomycin from Chemtraco for resale to Lane Agri in early 1983. On February 21, 1983, Chemtraco confirmed the Amexchem order for flavomycin, noting the 4% concentration level. Dall knew, then, that Amexchem was importing for resale flavomycin 4%. Stipulation.

The flavomycin 40 shipment arrived in the United States on March 19, 1983. The FDA issued a "may proceed" notice for the shipment on March 24, 1983, although the documents which Amexchem rendered to Customs and the FDA stated that the flavomycin was 4%. Stipulations 1(b), 1(c), Dall Affidavit ¶ 40; Amexchem Exhibits 11, 32.

The flavomycin 40 shipment arrived later than expected, and, in the meantime, Lane Agri had purchased needed flavomycin from American Hoechst. Lane Hearing Testimony. Therefore, Amexchem did not immediately deliver the flavomycin to Lane Agri. Instead, Amexchem stored the shipment, reminding Lane Agri in an April, 1983 letter that the flavomycin 4% was on hand. Amexchem Exhibit 47.

On June 22, 1983, Amexchem shipped the flavomycin and mailed the invoice, which specified the 4% concentration, to Lane Agri. In late July, 1983, Lane informed Dall that Lane Agri was not authorized to use flavomycin 4%.[14] Amexchem immediately removed the flavomycin to Continen-

---

ment. Government Exhibit 1139A. The 200 shipment is not involved in this case. Both Amexchem and the FDA confused the two shipments on occasion.

**13.** To the contrary, Lane testified that he did specify a 2.2% concentration level in his discussions with Dall regarding the purchase of flavomycin. However, the price Dall offered during these discussions corroborates Dall's highly credible testimony on this point. Amexchem usually offered prices 10–20% below domestic prices. Dall Hearing Testimony. Lane Agri had previously dealt with Amexchem, and was aware of the approximate discount. The price Dall offered Lane on the flavomycin falls within this range, assuming the flavomycin is 4%. However, Dall's price, if applied to flavomycin 2.2%, would register at 55% below the domestic price of flavomycin 2.2%.

Also, two months before Lane Agri received the flavomycin 40 shipment, Amexchem sent Lane Agri a letter reminding Lane Agri that the flavomycin was on hand. Amexchem Exhibit 47. This letter noted the 4% concentration level of the flavomycin. Lane Agri made no response to this letter.

**14.** According to Lane's testimony, the arrival of the flavomycin 40 shipment at Lane Agri came as a surprise because Lane and Dall had not yet agreed on a price for the flavomycin. Lane explained the delay in notifying Dall, stating that the flavomycin packaging lacked any reference to potency, and the Amexchem invoice, which specified potency, did not arrive until after the shipment arrived. After Lane received the invoice, he called Dall to inform him that Lane Agri could not use the 4% flavomycin.

tal Warehouse in Des Moines, Iowa, for storage. Stipulation; Dall Hearing Testimony.

Amexchem then attempted to find a legal use for the flavomycin 40 shipment. Dall requested Lane to try to secure FDA approval for blending the flavomycin down to 2.2%. By the time Dall became fully aware that such approval would not be forthcoming, it was too late to stop delivery on the second flavomycin shipment. Dall Hearing Testimony. That flavomycin 200 shipment left Antwerp, Belgium on August 16, 1983, and arrived in New York on September 2, 1983. Stipulation.

As with the first shipment, the FDA issued a "may proceed" notice on the flavomycin 200 shipment. Stipulation 2(c). Upon this shipment's release from Customs, Amexchem sent the shipment directly to Continental Warehouse, pending authorization for use or reexportation.[15] Stipulation 2(d); Dall Affidavit ¶ 44; Dall Hearing Testimony; Amexchem Exhibit 48. The shipment arrived at Continental Warehouse on September 13, 1983.

On June 6, 1984, the State of Iowa issued a stop sale order on both shipments of flavomycin. The U.S. Marshals in Des Moines, Iowa seized the shipments of flavomycin on August 3, 1984.

All the flavomycin remains unchanged, unused, and in the original containers. Dall Hearing Testimony. As Hoechst manufactured the flavomycin, the FDA does not assert that there is a health or safety problem with the flavomycin.

### E. Elancoban 40

On November 24, 1982, Dall wrote a letter to Lane concerning the importation of elancoban for Lane Agri. Elancoban is Eli Lilly's tradename for a drug generically known as monensin. Lane and Dall Hearing Testimony. In the letter, Dall wrote

that Amexchem is "very competitive with monensin 10%." Lane Exhibit 1. Monensin 10% and 13% are approved concentrations of monensin in the United States. Lane Hearing Testimony; Stipulation.

Amexchem ordered monensin 10% from Chemtraco on May 14, 1983, with the intent to resell the monensin to Lane Agri.[16] However, the monensin which arrived in New York on June 23, 1983 was monensin 20%, which is not an approved concentration in the United States. Dall did not know, and had no reason to know, that the monensin was 20% concentration until the shipment arrived in Amexchem's New Jersey warehouse. Dall Affidavit ¶ 45; Dall Hearing Testimony. As soon as Dall discovered the potency problem, on June 30, 1983, he had the monensin taken directly to Continental Warehouse. Stipulations 3(d) and (e); Dall Affidavit ¶ 45.

The State of Iowa issued a stop sale order on the monensin on June 6, 1984, and U.S. Marshals in Des Moines seized the monensin on August 3, 1984.

As the monensin was manufactured by Eli Lilly, the FDA does not assert that there is a health or safety problem with the monensin. The monensin 40 shipment remains unchanged, unused in its original containers. Dall Hearing Testimony.

### III. Procedural History

On July 30, 1984, August 2, 1984 and September 6, 1984, the United States filed complaints in three districts seeking the condemnation of the twelve lots of drugs. This court consolidated all three cases in an order dated February 14, 1985. On February 21, 1985, Amexchem filed an answer admitting all the allegations of the complaints and requesting permission to reexport the drugs to its original foreign supplier.

---

**15.** Lane's testimony contradicts that of Dall on this point. According to Lane, the flavomycin 200 shipment arrived at Lane Agri first before it was sent on to Continental Warehouse. However, the court believes the highly credible testimony of Dall, corroborated by convincing documentary evidence, that Amexchem sent the flavomycin 200 shipment directly to Continental Warehouse.

**16.** The price Dall quoted Lane on the monensin corroborates Dall's testimony that he ordered monensin 10%. Amexchem Exhibit 49.

The court entered a consent decree of condemnation as to the twelve lots subject to seizure on March 7, 1985. The decree condemned all twelve lots as adulterated under section 501(a)(5) of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 351(a)(5), because they are unapproved new animal drugs. In addition, the decree condemned some of the lots as being misbranded under 21 U.S.C. § 352(c) for foreign labeling, and all but two of the lots as being misbranded under 21 U.S.C. § 352(f)(1) for failure to bear adequate directions for use. The court, in the decree, deferred ruling on the reexportation issue.

On February 22, 1985, Amexchem again moved for reexportation in lieu of destruction. The Government objected, and, on May 30, 1985, this court issued an order determining several legal issues the Government had raised with regard to the FDCA's reexportation provisions. In that order, this court deferred making a final determination of Amexchem's motion for reexportation of the seized drugs in lieu of destruction, pending a factual hearing. As stated above, the court held a factual hearing on Amexchem's motion for reexportation in June and July, 1985.

On December 18, 1985, this court, by oral ruling, granted Amexchem's motion for reexportation in lieu of destruction. This opinion reiterates, in much greater detail, that oral ruling.

## IV. Statutory Requirements for Reexportation of Condemned Drugs

█ Section 304(d)(1) [17] of the FDCA, 21 U.S.C. § 334(d)(1), and section 801(d)(1) [18] of the FDCA, 21 U.S.C. § 381(d)(1), which is incorporated reference in section 304(d)(1), permit the reexportation of condemned imported drugs, provided certain requirements have been met. Importers seeking to reexport drugs under these provisions have the burden of pleading and proving satisfaction of the statutory requirements. *United States v. 76,552 Pounds of Frog Legs*, 423 F.Supp. 329, 337 (S.D.Tex.1976).

█ Amexchem has stated that it intends to reexport the articles of drugs to Chemtraco, Amexchem's original foreign supplier. Under § 304(d)(1), if articles are to be reexported to the "original foreign supplier," the requirements found in § 801(d)(1)(A) and (B) need not be met. In its May 30, 1985 opinion, this court concluded that the phrase "original foreign suppli-

17. Section 304(d)(1) provides in relevant part: If the article [condemned under this section] was imported into the United States and the person seeking its release establishes (A) that the adulteration, misbranding, or violation did not occur after the article was imported, and (B) that he had no cause for believing that it was adulterated, misbranded, or in violation before it was released from customs custody, the court may permit the article to be delivered to the owner for exportation in lieu of destruction upon a showing by the owner that all of the conditions of section 381(d) of this title can and will be met: ... *And provided further,* That where such exportation is made to the original foreign supplier, then clauses (1) and (2) of section 381(d) of this title and the foregoing proviso shall not be applicable; and in all cases of exportation the bond shall be conditioned that the article shall not be sold or disposed of until the applicable conditions of section 381(d) of this title have been met.

18. Section 801(d)(1) provides:
(1) A food, drug, device, or cosmetic intended for export shall not be deemed to be adul-

terated or misbranded under this chapter if it—
(A) accords to the specifications of the foreign purchaser,
(B) is not in conflict with the laws of the country to which it is intended for export,
(C) is labeled on the outside of the shipping package that it is intended for export, and
(D) is not sold or offered for sale in domestic commerce.
This paragraph does not authorize the exportation of any new animal drug, or an animal feed bearing or containing a new animal drug, which is unsafe with the meaning of section 360b of this title.
In its May 30, 1985 opinion, this court determined that the final sentence of § 801(d)(1) does not prohibit the reexportation of seized new animal drugs. This court reasoned that the words "this paragraph" clarify that the last sentence does not prohibit reexportation authorized by other paragraphs, such as § 304(d)(1). In addition, the language and legislative history of § 304(d)(1) reflect that a § 304(d)(1) clearly authorizes the reexportation of new and unapproved animal drugs.

er" in § 304(d)(1) is not limited to the original manufacturer. Therefore, Amexchem need only show that it meets the following four requirements for reexportation: (1) the adulteration or misbranding of the articles, or any other violation, did not occur after the articles were imported, § 304(d)(1)(A); (2) the person or firm seeking to reexport the articles had no cause for believing the articles were adulterated, misbranded or in violation before they were released from Customs custody, § 304(d)(1)(B); (3) the articles are labeled on the outside of the shipping package that they are intended for export, § 801(d)(1)(C); and (4) the articles are not sold or offered for sale in domestic commerce, § 801(d)(1)(D).

■ Satisfaction of all four of the requirements does not mandate an order of reexportation in lieu of destruction; the court, in its discretion, may order reexportation once all the requirements have been met. *Frog Legs*, 423 F.Supp. at 337. As set out below, the court now finds that Amexchem has satisfied all four statutory criteria, and, in its discretion, orders reexportation in lieu of destruction.

### A. Section 304(d)(1)(A): No Adulteration, Misbranding or Violation After Importation

Amexchem has established that the adulteration, misbranding or violation did not occur after the articles were imported. The evidence Amexchem presented during the hearing clearly establishes that all of the drugs in all 12 shipments remain packaged in their original containers and that Amexchem has not processed or altered any of the drugs in any way. Indeed, the FDA does not contend that Amexchem has repackaged or processed the drugs since Customs released the drugs from custody.

The Government does contend, however, that Amexchem misbranded the terramycin 167 and the flavomycin 40 and 200 shipments after importation. According to the Government, Amexchem's shipment of the terramycin to IMS and the flavomycin to Lane Agri constituted "misbranding" un-

der section 502 of the FDCA, 21 U.S.C. § 352(f)(1), because neither firm had authorization from the FDA to use those products.

The Government's argument fails both in its factual account and its statutory interpretation. First of all, at the time Amexchem sent the terramycin 167 shipment to IMS, IMS was, in fact, an authorized blender of Pfizer terramycin. However, as both IMS and Amexchem understood, IMS was not authorized to "recondition" the Italian labeled terramycin, absent FDA approval and supervision. Also, as stated above, Dall's testimony at the hearing, which was corroborated by highly credible documentary evidence, established that Amexchem never sent the flavomycin 200 shipment to Lane Agri. Amexchem sent that shipment directly to Continental Warehouse.

■ Second, the Government misinterprets section 502(f)(1). That section merely provides that a drug is misbranded unless its labeling bears adequate directions for use. Neither subsection (f)(1) of section 502, nor any other subsection of section 502, refer to shipment to an unauthorized purchaser as "misbranding." Given that section 502 specifies numerous circumstances in which a drug may be considered "misbranded," but fails to mention shipment as such a circumstance, the court now finds that, under the doctrine of *expressio unius est exclusio alterius*, a drug is not "misbranded" merely because it is shipped to an unauthorized purchaser.

■ Furthermore, in the consent decree of March 7, 1985, the terramycin and flavomycin shipments were condemned as "misbranded" under § 352(f)(1) for failing to bear labels with adequate directions for use, and the terramycin shipments were also condemned as "misbranded" under § 352(c), for bearing foreign labels. The reference in section 304(d)(1)(A) to "the" misbranding refers to the misbranding which led to the seizure of the drugs, in this case, the misbranding charged in the consent decree, and not any subsequent

alleged misbranding. The misbranding charged in the consent decree clearly did not occur after Amexchem imported the drugs.

### B. Section 304(d)(1)(B): No Cause For Believing The Drugs Were Adulterated, Misbranded Or In Violation Before Release From Customs Custody

The Government asserts that Amexchem had actual or constructive knowledge that several of the shipments were violative before Customs released the shipments. According to the Government, Amexchem had actual knowledge that the six oxytetracycline shipments were "misbranded" before release from Customs because Dall was aware that the FDA required a specific customer on all imported OTC shipments, and Amexchem had no specific orders for the six OTC shipments prior to importation. The Government also contends that Amexchem had actual knowledge that the flavomycin 200 shipment was not approved for sale in the United States prior to release from Customs, because Lane advised Dall in June and July of 1983 that Lane Agri could not use flavomycin 4%.

The Government, in addition, argues that Amexchem had constructive knowledge of the violative condition of the flavomycin 40 and 200 and the elancoban 40 shipments prior to release from Customs. Flavomy-

cin 4% and Elancoban 20% do not appear in the lists of approved drugs in the Code of Federal Regulations, 21 C.F.R. §§ 558.95, 558.355. Therefore, the Government claims Amexchem had constructive knowledge, through the Code of Federal Regulations, that these shipments were violative, and such constructive knowledge is sufficient to meet the "cause to believe" requirement of § 304(d)(1)(B). The court now addresses each of these arguments below.

### 1. Actual Knowledge That The OTC Shipments Were Misbranded Prior To Customs Release

It is at this juncture that the court first addresses itself to a problem pervasive in this action, that is, the FDA's failure to adopt its unwritten, varying, and highly intrusive "policies" as written, published regulations. Here, the FDA claims it has a policy of requiring a specific customer prior to the importation of all OTC shipments.[19] This is referred to as the "matching letter" policy, because the FDA requires the importer and the authorized purchaser to submit "matching letters" establishing a firm order before Customs releases the drugs.

This matching letter and prompt action policies are not contained in the FDCA, the FDA regulations, or the FDA's internal manuals.[20] In addition, if the matching

---

**19.** Another "policy" upon which the FDA relies in this action is that an importer must report any discovered violation to the FDA within a reasonable time in order to preserve the reexportation remedy in § 304(d). This policy is referred to as the "prompt action" policy. The FDA asserts that reexportation is contingent on Amexchem's compliance with both of these policies. According to the FDA, Amexchem failed to comply with the matching letter policy; therefore, Amexchem does not meet the statutory requirement that it have no reason to believe the OTC was violative prior to Customs release. Also, Amexchem's failure to comply with the prompt action policy mandates that the court, in its discretion, deny Amexchem's reexportation motion. In order to avoid unnecessary repetition, the court will refer to both of the policies in the ensuing discussion concerning the notice and comment requirements of the Administrative Procedure Act, and the publica-

tion requirement of the Freedom of Information Act.

**20.** The Government argues that two FDA "Import Alerts" provide some documentary support for the matching letter policy. Attachments D and E to United States' Written Summary of the Evidence and Summary of the Law. However, these "Import Alerts" merely list new animal drugs and state that the importation of a new animal drug substance must be provided for in an approved New Animal Drug Application ("NADA") or an Investigational New Animal Drug Exemption ("INAD"). In the "Import Alert" dated March 26, 1982, the FDA states that most of the new animal drugs listed "are subject to approved NADAs for specified sponsors and bulk drug sources." The "Import Alert," dated November 4, 1983, provides that "[i]t is the responsibility of the distributor, whether the import broker or some other firm, to assure

letter policy exists at all, it is inconsistently followed by the FDA.[21] It is this court's position that the FDA should have published the matching letter and prompt action policies, as official rules or regulations, in the Federal Register, pursuant to the Administrative Procedure Act, 5 U.S.C. § 500 et seq. ("APA"), and the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The FDA's failure to so publish the policies now prohibits the FDA from enforcing the policies against Amexchem in this action.

Section 553 of the APA sets out the procedure for agency rule making.[22] Under that section, an agency must publish in the Federal Register a general notice of proposed rule making, and must allow interested persons to participate in the rule making procedure.[23] Section 553 exempts certain agency actions from its scope; however, as outlined below, none of those exemptions apply in this case.

Section 553(a) exempts from coverage agency actions involving the military or foreign affairs functions of the United States, agency management or personnel, or public property, loans, grants, benefits or contracts. First, the Government does not, and cannot, contend that these policies involve the military or public property, loans, grants, benefits or contracts. Second, although policies affecting imports and exports may implicate foreign affairs, the foreign affairs exemption does not ap-

---

that these drugs are only shipped to processors legally entitled to receive them."

Neither "Import Alert" imposes a new, or recognizes an existing, matching letter requirement. To the contrary, this court interprets the "Import Alerts" as merely requiring a NADA or INAD for a new animal drug to be in existence at importation. There is not even a requirement to present the NADA or INAD to the FDA, let alone matching letters demonstrating a firm order. In this case, both V.P.O. and Pfizer, the only animal feed manufacturers to whom Amexchem offered the oxytetracycline, have approved NADAs for oxytetracycline. *See* 21 C.F.R. § 558.15.

21. Kenneth M. Klein, an FDA Compliance Officer, testified that the FDA at times allows solicitation of orders after importation. Klein Affidavit ¶¶ 6, 8; Klein Hearing Testimony.

22. There can be no question, and the Government does not dispute, that the FDA falls within the definition of "agency" in section 551(1) of the APA.

23. Section 553 provides:
(a) This section applies, according to the provisions thereof, except to the extent that there is involved—
(1) a military or foreign affairs function of the United States; or
(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
Except when notice or hearing is required by statute, this subsection does not apply—
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
(2) interpretative rules and statements of policy; or
(3) as otherwise provided by the agency for good cause found and published with the rule.
(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

ply here, for these policies do not "provoke definitely undesirable international consequences." *Yassini v. Crosland,* 618 F.2d 1356, 1360 n. 4 (9th Cir.1980). Third, the policies do not merely involve agency management or personnel. *See, e.g., United States v. Hayes,* 325 F.2d 307 (4th Cir. 1963) (holding that an order of the Comptroller General giving an employee the authority to certify copies of office records need not be published in the Federal Register because it falls within the similar internal management exemption in section 552, now deleted).

■ Section 553(b) exempts from coverage agency interpretive rules, general statements of policy, rules of agency organization, procedure or practice, and agency action for which notice and public procedure would be impracticable, unnecessary, or contrary to the public interest. First, the policies in this case are not "interpretive rules." An interpretive rule is an administrative construction of a statutory provision on a question of law reviewable in the courts. *Pickus v. United States Parole Board,* 507 F.2d 1107, 1113 (D.C. Cir.1973); *Aiken v. Obledo,* 442 F.Supp. 628, 649 (E.D.Cal.1977). Interpretive rules clarify and explain existing statutes and regulations, and have neither force of law nor a substantial impact on those regulated. *Herron v. Heckler,* 576 F.Supp. 218, 231 (N.D.Cal.1983). *See also Powderly v. Schweiker,* 704 F.2d 1092, 1098 (9th Cir.

1983). The matching letter and prompt action policies do not explain existing statutes or regulations; neither the FDCA nor the FDA regulations mention such requirements. These policies have the force of law in that they constitute, in effect, further prerequisites an importer must satisfy before he or she can reexport safe, albeit violative, merchandise. Having the force of law, these policies are clearly not interpretive rules. *Aiken,* 442 F.Supp. at 653.

Second, these policies, although labeled as "policies" by the FDA, do not constitute "general statements of policy" under section 553(b). A general statement of policy is "a declaration which is used as a 'touchstone for future administrative action.'" *Aiken,* 442 F.Supp. at 653 (*quoting Ash Grove Cement Co. v. Federal Trade Commission,* 519 F.2d 934, 935 (D.C.Cir.1976).[24] Here, the policies are not "touchstones for future action" by the FDA; rather, the policies constitute "particularized mandate[s] ... [which] impose rights and obligations ... and ... have a substantial impact on those regulated." *Aiken,* 442 F.Supp. at 653 (citations omitted).

Third, the matching letter and prompt action policies are not rules of agency organization, procedure or practice. Although these policies do involve some procedural aspects, in essence, they establish standards of entitlement, rather than methods of operation. *See Aiken,* 442 F.Supp. at 649.[25]

**24.** The *Aiken* court defined "statements of a general policy" as that term is found in section 552(a)(1)(D) of the FOIA. However, this court finds the distinction between the terms "general statements of policy" in section 553(b) and "statements of general policy" in section 552(a)(1)(D) to be insignificant, and therefore finds the *Aiken* definition applicable in its discussion of section 553(b).

**25.** In *Herron* and *Aiken,* the courts discussed the "substantial impact" principle, a recent common law development. *Herron,* 576 F.Supp. at 232; *Aiken,* 442 F.Supp. at 649–50. Under this principle, courts minimize the distinction between "substantive," "interpretive" and "procedural" rules in determining administrative obligations under the APA. If any rule departs from existing practice and has a significant impact on those falling within its scope, then the agency

enacting the rule must comply with the notice and comment requirements of section 553, regardless of the rule's characterization as substantive, interpretive or procedural. This court need not rely on the common law "substantial impact" principle in this case. The FDA's policies fall squarely within the language of section 553; therefore, the FDA was required, by statute, to notify the public and solicit comments concerning the policies.

The court notes at this point that, even if the policies in question were characterized as procedural rules, and the FDA were therefore not required to comply with section 553, the FDA would still have to comply with the notice requirement in section 552(a)(1)(C) of the FOIA. *See infra* n. 27; *Human Resources Management, Inc. v. Weaver,* 442 F.Supp. 241, 247 (D.D.C. 1978); *Aiken,* 442 F.Supp. at 652. In this case,

Fourth, the FDA has not, for good cause, found that a notice and comment procedure concerning the two policies would be "impracticable, unnecessary, or contrary to the public interest." In *Yassini*, 618 F.2d 1356, the court found the good cause exception applicable to a directive by the Commissioner of the Immigration and Naturalization Service rescinding a deferred departure date previously granted to Iranian nationals. The court found persuasive the Government's argument that the good cause exception applied because "public interest warranted a prompt response to the embassy takeover in Iran." *Yassini*, 618 F.2d at 1360. In the present case, the Government does not contend that the good cause exception applies, and this court now finds there is no basis in the facts of this case for application of the good cause exception.

In summary, the court finds that the matching letter and good faith policies are not exempt from the notice and comment requirements of Section 553. They are not interpretive rules, general statements of policy, rules of agency organization, procedure or practice, or rules for which notice and comment would be impracticable, unnecessary or contrary to the public interest. On the contrary, the two policies are "substantive rules of general applicability" as that term is defined in the statutes and cases.

■ Section 551(4) defines a "rule" as follows:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

The two policies clearly fit within this statutory definition: they are agency statements which are prospectively applicable to a class of importers generally and designed to prescribe law. Also, the policies are "rules" as the courts have construed that term: they are generally binding on importers, the affected public, they provide specific standards to regulate future conduct, and they make a substantive impact on the rights and duties of persons subject to their limitations. *See Herron*, 576 F.Supp. at 230.[26]

■ The policies are substantive, rather than interpretive or procedural, rules. Substantive rules effect a change in existing law or policy. *Powderly*, 704 F.2d at 1098. They impose mandatory obligations upon members of the public, directly affecting pre-existing legal rights or obligations. *Appalachian Power Co. v. Train*, 566 F.2d 451, 455 (4th Cir.1977). As the Fourth Circuit has stated:

[A substantive rule is] of such a nature that knowledge of it is needed to keep the outside interests informed of the agency's requirements in respect to any subject within its competency, as a guide in their conduct of day-to-day affairs, and to instruct them in regard to the presentation to the agency of any subject for impartial consideration or action thereon.

*Hayes*, 325 F.2d at 309 (citations omitted).

The matching letter and prompt action policies are thus substantive rules. They create precise, objective limitations where none previously existed; they create law. Also, importers subject to the policies need to know about the policies in order to con-

the FDA has failed to comply with both section 553 and section 552.

**26.** The matching letter and prompt action policies are "rules" despite the FDA's label of "policy." It is the impact, rather than the label, of an agency action that determines whether that ac-

tion is a "rule" under section 551(4). *Western Coal Traffic League v. United States*, 694 F.2d 378, 392 (5th Cir.1982), *on rehearing,* 719 F.2d 772 (5th Cir.1983), *cert. denied,* 466 U.S. 953, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984). *See, e.g., Herron*, 576 F.Supp. at 230.

duct their businesses within the legal limits.

As substantive rules of general applicability, the FDA was not only required to comply with the notice and comment provisions of section 553 of the APA with regard to the policies. The FDA was also required to comply with the publication provision in section 552(a) of the FOIA.[27] Under section 552(a)(1)(D), the FDA is required to publish in the Federal Register

27. Section 552(a) of the FOIA provides in part:
(a) Each agency shall make available to the public information as follows:
(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—
\* \* \* \* \* \*
(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;
(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency;
\* \* \* \* \* \*
Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.
(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—
\* \* \* \* \* \*
(C) administrative staff manuals and instructions to staff that affect a member of the public;
unless the materials are promptly published and copies offered for sale.
The policies in this case, as analyzed in the text of this opinion, are substantive rules of general applicability. Therefore, the policies squarely fall within the purview of section 552(a)(1)(D). However, even if the court considered the policies to be procedural rules, statements of general policy or interpretations of general applicability, the FDA would still need to publish the policies in the Federal Register, which the FDA has failed to do.
The FDA offered the two "Import Alerts" into evidence, presumably as documentary support

"substantive rules of general applicability." Section 552(a) also provides that a person may not be adversely affected by a matter required to be published and not so published, "[e]xcept to the extent that a person has actual and timely notice of the terms thereof." In this case, Amexchem did not have actual and timely notice of the policies which were required to be published in the Federal Register under section 552(a)(1)(D).[28] The policies should not

for the matching letter policy. Although the FDA offered no evidence or testimony that the "Impact Alerts" were part of an FDA staff manual, the "Import Alerts" are marked, on their face, "Regulatory Procedure Manual Part 9, Imports Chapter 9–79." Therefore, the FDA may claim that the matching letter policy was part of an "administrative staff manual" and the FDA was only required, under section 552(a)(2)(C), to make the staff manual "available for public inspection and copying." This argument fails because the "Import Alerts," as discussed above, do not set forth the matching letter policy. Even if the "Import Alerts" did state the matching letter policy, the FDA failed to present evidence that the Regulatory Procedural Manual was available for public inspection and copying. Also, because the policy is an "administrative directive of general applicability," the FDA might still be required to publish the policy in the Federal Register, regardless of its placement in a staff manual. *See Herron*, 576 F.Supp. at 233.

28. The Government offered into evidence a telex and two letters, all authored by Dall, to support the claim that Dall did have actual and timely notice of the matching letter policy. In the March 7, 1983 telex from Dall to V.P.O., Dall requested V.P.O. to "issue your letters as before to FDA attention Mr. Ira Flaum with a copy to us so that these copies can be attached to our Customs entry in order to get prompt release from FDA." Sigler Group Exhibit, Shipment # 5, p. 10. In a February 16, 1983, letter from Dall to the FDA, Dall stated *"we shall try* in the future to obtain these letters from V.P.O. prior to arrival of the material in New York so that such letters can be attached to our customs entry." Sigler Group Exhibit, Shipment # 2, p. 3 (emphasis added). Also, in an October 5, 1983 letter from Dall to the FDA, Dall stated that "[t]he method of clearing all OTC shipments to V.P.O. was to attach a V.P.O. letter to the customs entry." Government Exhibit 1210.
The Government's notice argument must fail. The statute requires actual and timely notice of the terms of the policies. The courts have also read into the "notice" exception of section 552(a)(1), in order to make that provision mean-

therefore adversely affect Amexchem in this action.

In fact, the policies cannot adversely affect any importer in any action. Section 706 of Title 5 of the United States Code provides:

The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law....

The FDA "adopted" both the matching letter and prompt action policies in violation of the notice and comment provisions of section 553 of the APA and the publication provision of section 552 of the FOIA. Therefore, the court, for purposes of this case, declares void and sets aside the two policies. *See Aiken*, 442 F.Supp. at 650.

■ Voiding these two policies for "what at first blush appears to be a technicality is not as pointless as it may seem," because sections 552 and 553 serve impor-

tant interests. *Aiken*, 442 F.Supp. at 651 (*quoting Kelly v. United States Department of Interior*, 339 F.Supp. 1095, 1102 (E.D.Cal.1972)). First, as the *Kelly* court noted:

[T]he 30-day notice rule [in section 553] serves an important interest, the right of the people to present their views to the government agencies which increasingly permeate their lives. The interchange of ideas between the government and its citizenry provides a broader base for intelligent decision-making and promotes greater responsiveness to the needs of the people, especially in cases such as this where Congress has only roughed in its program.

*Kelly*, 339 F.Supp. at 1102. In this case, public input and scrutiny would have ensured, and will ensure, if the FDA validly enacts the policies as rules or regulations following this decision, that the policies are reasonable and well-tailored to both the needs of future animal drug importers and the American public.[29]

■ Also, the notice and comment and publication requirements ensure that those

---

ingful, a requirement of precision. *United States v. Anaconda Co.*, 445 F.Supp. 486, 497 (D.D.C.1977). *See, e.g., Human Resources Management*, 442 F.Supp. at 247. The Government failed to provide any evidence that Amexchem had actual and timely notice of the precise contours of the matching letter policy. This is evidenced in Dall's statement in the February 16, 1983 letter that Amexchem "will try" to obtain letters from V.P.O. in the future. Language such as this signals recognition of preferred practices, not mandatory requirements. The Government failed to produce any evidence that it clearly and exhaustively set forth the matching letter policy for Amexchem prior to the importation of the OTC. In all of the cases this court has considered where the court found the notice exception to apply, the Government presented evidence of affirmative efforts to notify those subject to administrative actions. *See, e.g., United States v. Hall*, 742 F.2d 1153, 1155 (9th Cir.1984) (evidence that Government announced regulation prohibiting entry on military base over public address system and posted signs with regulation printed on them); *Yassini*, 618 F.2d at 1362 (evidence that INS sent notice of revocation to Iranian nationals); *Central Arkansas Auction Sale, Inc. v. Bergland*, 570 F.2d 724, 727–28 (8th Cir.1978) (evidence that Government furnished petitioners with the De-

partment of Agriculture administrative opinion announcing the new method of computation before the administrative hearing), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1121 (1978); *Anaconda*, 445 F.Supp. at 497 (evidence that Government sent subpoena to aluminum wiring industry representatives detailing rules governing investigational subpoenas); *Human Resources Management*, 442 F.Supp. at 247 (evidence that Small Business Administration sent plaintiffs a letter detailing "the exact procedures" to be applied to their case).

29. Had the FDA engaged in notice and comment procedures with regard to the matching letter policy, it surely would have considered the effect on foreign competition. The matching letter policy inhibits the importation of drugs from foreign sources, for manufacturers are reluctant to commit to purchase long before actual delivery, given the possible fluctuations in price. Also, the lack of any clear, written policies to which importers may refer has inhibited importation for reasons made clear in this action. Importers uncertain about unwritten, unpublished legal requirements may not want to risk legal action and the resultant expense. The inhibition of foreign competition generally leads to an increase in domestic prices, an undesirable result for the American public.

460

subject to agency actions will be informed and thus able to conduct day-to-day affairs within any legal limits set by the agency. *Hayes*, 325 F.2d at 309. Certainly, in this case, written official rules or regulations would have greatly aided Amexchem, which never intended or schemed to evade the FDCA or FDA regulations, but which never received clear guidance as to its legal obligations.

▮ Finally, the requirements of sections 552 and 553 also prohibit agency officials from engaging in ad hoc decision making in order to possibly confuse, and thereby maintain control over, those subject to agency actions. In *National Wildlife Federation v. Clark*, 577 F.Supp. 825, 828–29 (D.D.C.1984), the court held that the Secretary of the Interior was bound by a prior regulation, which directed him to withdraw lands from coal leasing, until the agency rescinded the regulation through section 553 notice and comment procedures. In rendering void the Secretary's attempted rescission, the court stated that the Secretary's action could not withstand "the rising number of appellate decisions condemning ad hoc actions by Department heads." *Clark*, 577 F.Supp. at 828. The court distinguished *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), *overruled on other grounds, NLRB v. Hendricks County Rural Electric Membership Corp.*, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981), in which the Supreme Court gave the NLRB a choice between setting a certain standard through rule making or enforcement proceedings. According to the *Clark* court, both procedures in *Bell Aerospace* were judicially reviewable; however, the Secretary's attempted ad hoc rescission would not have been judicially reviewable.

In this case, the FDA's ad hoc policy making also fails to withstand the appellate decisions condemning ad hoc decision making. *See Clark*, 577 F.Supp. at 828, and cases cited therein. The FDA cannot, and should not, sporadically and inconsistently create or rely on policies, which are not in accordance with law, in order to maintain control over those regulated or to escape judicial review.

## 2. Actual Knowledge That The Flavomycin 200 Shipment Was In Violation Prior To Customs Release

The Government contends that Amexchem actually knew that the flavomycin 200 shipment was not approved for sale in the United States because Lane so advised Dall in June and July of 1983. The court finds to the contrary for several reasons. First, as set out above in the facts, Lane did not inform Dall that Lane Agri could not use the flavomycin 4% until late July, 1983. Prior to that time, Dall thought that 4% was the only available flavomycin concentration level and that Lane Agri had been using flavomycin 4% in the past. At the time, American Hoechst, another animal feed manufacturer, had been importing flavomycin 4% from its West German parent corporation, which it then blended down to the approved 2.2% level.

Also, when Lane Agri informed Amexchem about the concentration problem, Amexchem immediately removed the flavomycin to storage and attempted to find a legal use for the flavomycin. Dall requested Lane to seek FDA approval, similar to that given to American Hoechst, for blending the flavomycin down to 2.2%.[30] By the

---

**30.** The court finds that Dall's attempt to find a lawful use for the flavomycin was reasonable and that Dall had no reason to believe his attempt would be fruitless. Hoechst in West Germany manufactured this flavomycin; consequently, there was no question as to the safety or quality of the drugs. Dall merely suggested that Lane Agri secure the same FDA approval as given to American Hoechst for blending flavomycin 4% to 2.2%.

Section 334(d)(1) provides that, after a court has condemned merchandise under that section,

"the court may by order direct that such article be delivered to the owner thereof to be destroyed or brought into compliance with the provisions of this chapter under the supervision of an [FDA] officer or employee." Although not applicable to Dall's efforts in late July and early August of 1983, because the flavomycin was not condemned, this provision demonstrates Congress' intent to promote the "reconditioning" of safe drugs which can be brought into compliance with the provisions of the FDCA and the FDA regulations.

time Dall became fully aware that the FDA would not approve Lane Agri's request for blending authorization, Dall could not stop the delivery of the flavomycin 200 shipment. That shipment left Belgium on August 16, 1983 and arrived in New York on September 2, 1983.

### 3. Constructive Knowledge That The Flavomycin 40 and 200 Shipments Were In Violation Prior To Customs Release

The Government argues that Amexchem had "constructive knowledge" that the flavomycin shipments were in violation prior to Customs release because the 4% concentration level is not listed as an approved concentration in the Code of Federal Regulations, 21 C.F.R. § 558.95. However, although the 4% level is not listed as an approved concentration, American Hoechst, during this time period, imported and blended flavomycin 4% with FDA authorization. Therefore, Amexchem could have possibly sold the flavomycin 4% to at least one authorized purchaser, American Hoechst.

The Government's constructive knowledge argument must fail, then, because it is contingent upon the matching letter/firm order policy, or at least a variant of that policy. The Government seems to be asserting a policy that once an importer has an order, that importer, upon discovering that the proposed buyer is unauthorized, may not then sell to an authorized purchaser. This court holds this policy invalid for the reasons set forth in detail above. Amexchem "constructively knew" that it could have sold the flavomycin 4% to American Hoechst and other animal feed manufacturers with FDA authorization, 21 C.F.R. § 558.95. Therefore, Amexchem did not have reason to believe that the flavomycin 40 and 200 shipments were in violation prior to Customs release.

### 4. Constructive Knowledge That The Elancoban 40 Shipment Was In Violation Prior To Customs Release

According to the Government, Amexchem had constructive knowledge that the elancoban shipment was in violation because the 20% concentration level is not listed as an approved concentration in the regulations, 21 C.F.R. § 558.355. The fatal flaw in the Government's argument is that Dall never intended to sell anything but elancoban 10%, an approved concentration. Dall's November 24, 1982 letter to Lane Agri stated only that Amexchem is "very competitive with monensin [the generic name for elancoban] 10%."

Dall ordered elancoban 10% from Chemtraco. Amexchem was completely surprised, when the shipment arrived at its New Jersey warehouse, to find elancoban 20%. Therefore, Amexchem had no reason to know, prior to Customs release, that the elancoban was of an unapproved concentration.

### C. Section 801(d)(1)(C) and (D): "Intended For Export" Labels And No Sale Or Offer For Sale Of The Articles In Domestic Commerce

The Government, relying on section 801(d)(1)(D), contends that Amexchem may not export the seized drugs if Amexchem has ever offered them for sale in domestic commerce. However, the language of section 304(d)(1) and the FDA's own Compliance Policy Guide convincingly persuade the court to find to the contrary.

Section 304(d)(1) provides that "the court may permit the article to be delivered to the owner for exportation in lieu of destruction upon a showing by the owner that all of the conditions of section 381(d) of this title *can and will be met*" (emphasis added). Congress clearly intended the requirements of section 801 to be only prospective conditions on reexportation, and, so that courts would be able to assure future performance of the prospective conditions, Congress provided for a bond conditioned on compliance with section 801(d).

Section 7153.06 of the FDA's Compliance Policy Guide also refutes the Government's contention. Government Exhibit Klug A. That section states that exportation may be permitted where the importer makes "every effort to retrieve any portion of the lot that may have been distributed." Thus,

the FDA recognizes that drugs previously offered for sale, and even already delivered, are still eligible for reexportation.

The requirements in section 801(d)(1)(C) and (D) are therefore conditions on Amexchem's reexportation of the twelve shipments of seized drugs. Amexchem has related to the court that it intends to fully comply with the labeling requirement and the prohibition on sale of the drugs in domestic commerce. The court not only will set an appropriate bond to ensure compliance with these conditions, but has also required Dall to subject himself to the jurisdiction of the court so that the court's exportation order may be effectively enforced.

### D. Factors Considered In The Court's Exercise of Discretion

Amexchem has shown that it has met, or will meet, all of the statutory requirements for reexportation in lieu of destruction. As stated above, satisfaction of the statutory requirements does not mandate an order of reexportation. The court has discretion, once the statutory requirements have been met, to order reexportation of the condemned drugs.

The Government argues that the court should not, in its discretion, allow Amexchem to reexport the drugs because of Amexchem's alleged actions with regard to the seized drugs and with regard to drugs not subject to seizure. Amexchem filed a motion in limine objecting to the introduction and consideration of (1) evidence of events involving the seized drugs which occurred long after the drugs cleared Customs; and (2) evidence concerning drugs not subject to seizure. The court now denies Amexchem's motion in limine, but takes Amexchem's objections into account in its consideration of the weight to be given this evidence.

As for the drugs subject to seizure, the Government contends that the following actions were taken by Amexchem and that such actions dictate a refusal of reexportation: (1) Amexchem shipped the foreign labeled tylosin to International Nutrition, an unauthorized purchaser, without advising International Nutrition that the product had foreign labels, and without informing the FDA of the foreign labels; (2) Amexchem attempted to reexport the tylosin to Custom Feed Blenders, a firm which was not the original foreign supplier of the tylosin; (3) Amexchem presented a false letter to the FDA regarding the OTC 262 shipment, and distributed that shipment prior to release; (4) Amexchem offered OTC to Lane Agri, even though Dall knew that Lane Agri was not authorized to use OTC; (5) Amexchem misled the FDA in its responses to notices of detention on the OTC; (6) Amexchem offered the flavomycin to Custom Feed Blenders, even though Dall knew that Custom Feed Blenders was not authorized to use flavomycin 4%; and (7) Amexchem failed to advise the FDA concerning the problems with several of the shipments, including the flavomycin and elancoban, for more than a year after the drugs arrived in the United States (the prompt action policy).

Almost all of the above contentions are in direct conflict with the facts as found by this court. International Nutrition did know about the foreign labels on the tylosin 203 shipment prior to that shipment's arrival at International Nutrition on June 4, 1984. *See supra* n. 11. Amexchem enlisted the help of Custom Feed Blenders for possible export of the tylosin to Canada; it did not attempt, without FDA approval, to reexport the tylosin to Custom Feed Blenders. Amexchem did attach to the documents rendered to the FDA and Customs on the OTC 262 shipment a letter it had composed on V.P.O. stationery, indicating that V.P.O. had ordered the OTC in that shipment. However, V.P.O. had, in fact, originally ordered the OTC in that shipment, and Amexchem's intent in attaching the letter was not to fraudulently secure release of the drugs; rather Amexchem understood that a second letter from V.P.O. would secure the release of the drugs. Amexchem did not "distribute" the OTC shipment prior to release. Instead, it sent the shipment to Custom Feed Blenders for possible reexport immediately after its

arrival in New York, and when it was unable to promptly reexport the OTC 262 within ten days, Amexchem sent the shipment to a storage warehouse in Iowa. Amexchem did not offer the OTC to Lane Agri. Amexchem did not "mislead" the FDA in its responses to notices of detention on the OTC.[31] Amexchem did not offer the flavomycin to Custom Feed Blenders for use in the United States. Finally, even if Amexchem had failed to notify the FDA, within a reasonable time, concerning various problems with the shipments, the FDA's failure to enact and publish this policy as a valid regulation renders the policy void, for the reasons set forth in detail above.

As for shipments of drugs not subject to seizure, the Government contends that the following actions were taken by Amexchem and that such actions dictate a refusal of reexportation: (1) Amexchem reexported two OTC shipments without Customs supervision; (2) Amexchem shipped and sold a detained terramycin 167 shipment without FDA authorization; (3) Amexchem presented a false letter to the FDA regarding the terramycin 167 shipment; and (4) Amexchem sold detained virginiamycin and zinc bacitracim shipments to customers, who then used these drugs, all without FDA approval. The Government charges that Amexchem committed these actions in an attempt to characterize Amexchem as an importer scheming to evade the requirements of the FDCA and the FDA regulations. However, although Amexchem did export OTC to Canada, there is no evidence that Amexchem knew that there was any-

thing wrong with this exportation, or that anything was, in fact, wrong with it. Also, with regard to the three zinc bacitracim shipments, the FDA's inconsistent, confusing action with respect to the shipments refutes any bad faith on the part of Amexchem. Over the course of three months, the FDA sent to Amexchem a release with comment, a notice of refusal and a may proceed notice for the three identical zinc bacitracin shipments. Amexchem Exhibits 33, 37 and 39. With regard to the virginiamycin, the FDA refused entry of the drug because it was not the subject of an approved NADA. *See supra* n. 20. However, virginiamycin is listed as an approved drug in 21 C.F.R. § 558.635.

The extensive evidence regarding the seized articles demonstrates that Amexchem strove to discover, understand and comply with the statutory and regulatory requirements. Amexchem was in contact with the FDA throughout this time period. Amexchem Exhibits 4, 16, 17, 28, 30, 38, 51; Government Exhibits 314, 494, 565, 951, 1199B, 1199C, 1210, 1217, McDonald Attachment 2. Amexchem never opened or used, or intended to open or use, any of the drugs subject to this action. In fact, Amexchem sent all but three shipments directly to warehouses upon their arrival in the United States.[32] Amexchem was always aware, and made its customers aware, that no actions were to be taken with respect to the drugs without FDA authorization. The court finds that Amexchem never intended to circumvent any legal requirements.[33] Nothing in the FDCA

---

**31.** If anything, the FDA's actions with regard to the OTC shipments misled and confused Amexchem. As set out, *supra*, in footnote 9, the FDA issued notices of detention on four of the shipments, but issued a may proceed notice and a notice of release on two of the OTC shipments.

**32.** The three lots that Amexchem did not send directly to warehouses were the flavomycin 40, terramycin 167 and OTC 262 shipments. Amexchem did not initially warehouse the flavomycin and terramycin because Amexchem was not aware of the problems with those shipments until after they reached the customers. As soon as Amexchem found out about the problems, it promptly removed the drugs to warehouses. As

set out in the text, Amexchem sent the OTC 262 to Custom Feed Blenders not for use, but for possible reexportation. Amexchem removed from storage only two of the twelve shipments, the tylan and terramycin 167, in an effort to "recondition" those shipments. Amexchem, International Nutrition, and IMS all understood these drugs were not to be used, and Amexchem would not be paid, without FDA approval. When the FDA seized the drugs, all twelve shipments were sitting unopened in warehouses.

**33.** Even if there were proof that Amexchem intended to ignore its legal obligations, the court, in its discretion, could order reexporta-

or the FDA regulations suggests that destruction should be used as a punitive measure against a firm which unintentionally imports a technically violative product.

### V. Conclusion

For the reasons set forth above, the court finds and concludes that Amexchem has met the applicable statutory requirements and grants Amexchem's motion for reexportation in lieu of destruction. By an order accompanying this opinion, the court sets an appropriate bond and conditions for the reexportation.

### ORDER

On July 30, 1984, August 2, 1984, and September 6, 1984 Complaints for Forfeiture against the above described imported articles were filed on behalf of the United States of America by Richard C. Turner, United States Attorney for the Southern District of Iowa, Evan L. Hultman, United States Attorney for the Northern District of Iowa, and Dan K. Webb, then United States Attorney for this district.

The Complaints allege that each of the seized articles is adulterated within the meaning of 21 U.S.C. § 351(a)(5). The Complaints also allege that certain of the articles proceeded against are misbranded drugs within the meaning of 21 U.S.C. §§ 352(f)(1) and 352(c).

Pursuant to Warrants for Seizure and Monition, the United States Marshals for the Southern District of Iowa, the Northern District of Iowa, and the Northern District of Illinois seized more or less the following quantities of articles in their respective districts on August 15, 1984, August 3, 1984, and October 10, 1984.

Northern District Iowa

 262 bags Oxytetracycline,
 779 bags Oxytetracycline,
 154 bags Terramycin;

Southern District Iowa

 240 bags Flavomycin,
  53 drums Oxytetracycline,
  67 drums Oxytetracycline,
 120 drums Oxytetracycline,
  40 bags Elancoban,
  80 drums Oxytetracycline; and

Northern District Illinois

 167 bags Terramycin,
 203 bags Tylan 250.

Thereafter, AMEXCHEM International, Inc. intervened and filed Claims to the articles.

On February 4, 1985, this court consolidated the cases previously pending in the United States District Courts for the Northern and Southern Districts of Iowa with this case, 84 C 7677.

On February 21, 1985, claimant filed an answer (1) admitting the allegations in the Complaints; (2) affirmatively stating the alleged adulteration and that claimant had no cause for believing that any article was adulterated or misbranded before it was released from Customs custody; and (3) asking this court, pursuant to section 304(d)(1) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 334(d)(1), to issue an order directing, in lieu of destruction, that the articles be delivered to claimant for exportation to their original foreign supplier.

---

tion "regardless of the claimant's mala fides." *Frog Legs,* 423 F.Supp. at 338. In *Frog Legs,* the importer had intentionally repackaged and sold in the United States frog legs contaminated with poisonous salmonella. These articles were dangerous to health, and the importer was criminally convicted for the repackaging and sale of the articles. Despite the importer's intent to evade the law, the court permitted the importer to salvage the uncontaminated frog legs, citing the "congressional intent [behind sections 304 and 801] to prevent waste of food whenever it can be safely done." *Frog Legs,* 423 F.Supp. at 336. The Congressional intent cited in *Frog Legs*

clearly extends to the prevention of the destruction of completely safe animal drugs. *Amendments to Federal Food, Drug and Cosmetic Act: Hearings on H.R. 10519 Before Subcomm. on Health and Science of the House Comm. on Interstate and Foreign Commerce,* 84th Cong.2d Sess. 280–285 (1956) (statement of Harry S. Radcliffe, Executive Vice President, National Counsel of American Importers, Inc.). Therefore, even if there were proof of mala fides on the part of Amexchem, because the seized drugs have been shown to be completely safe, the court could order reexportation in its discretion to prevent waste of these useful animal drugs.

On March 7, 1985, this court entered a Decree of Condemnation as to all of the seized articles. The court also retained jurisdiction to issue such further decrees and orders as may be necessary to the proper disposition of the articles.

On May 30, 1985, this court issued a Memorandum Opinion and Order, deferring ruling on claimant's motion for exportation of the articles in lieu of destruction.

In June and July of 1985, the court held a hearing in order to determine whether claimant had met, or would be able to meet, the applicable statutory requirements for reexportation.

On February 28, 1986, the court issued findings of fact and conclusions of law, finding and concluding that claimant has met the applicable statutory requirements for exportation in lieu of destruction.

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED, pursuant to 21 U.S.C. § 334(d)(1), that claimant's motion for reexportation to the original foreign supplier, Chemtraco B.V., is granted; and it is further

ORDERED, ADJUDGED AND DECREED that if claimant:

(1) executes and files with the Clerk of this court a good and sufficient bond in the sum of $50,000.00 approved by this court, payable to the United States of America, and conditioned on the claimant's abiding by and performing all of the terms of this order and those of any further decrees or orders entered in this action; and

(2) pays in full court costs and other proper expenses of this action, as follows:

(a) costs of service of process, attachment, and publication in the amount of $212.57;

(b) costs of storage through date of release from storage; and

(c) additional proper expenses

the United States Marshals, upon receiving notice that the foregoing bond has been posted and costs have been paid, shall release the seized articles to claimant; and it is further

ORDERED, ADJUDGED AND DECREED, that after the United States Marshals release the articles,

(3) Claimant shall label the shipping packages "for export only;" for purposes of this order the term "shipping package" shall mean the outer wrapper covering a pallet of bags or drums where such outer wrapper exists;

(4) Claimant shall notify both the Chicago District Office, United States Food and Drug Administration ("FDA"), Department of Health and Human Services, 433 West Van Burn Street, Chicago, Illinois 60607, and the United States Customs Service ("Customs"), Department of Treasury, 610 S. Canal Street, Chicago, Illinois 60607, that claimant is prepared to reexport the articles of drug pursuant to the requirements of 21 U.S.C. § 334(d)(1);

(5) Claimant shall use a bonded carrier for transportation of the articles of drug. During transportation to the port of exportation the articles shall be under seal by Customs;

(6) Claimant shall provide FDA and Customs at least one working day in advance of delivery to the steamship line with the name of the steamship line that will transport the articles from Chicago to Rotterdam, The Netherlands, the address of that carrier's receiving dock in Chicago, the date(s) the articles are expected to arrive at the dock in Chicago, and the port of embarkation;

(7) FDA representatives may inspect the articles at the port of embarkation at reasonable times, provided such inspection does not interfere with the embarkation of the articles.

(8) Claimant shall obtain a signed "Transportation Entry and Manifest of Goods Subject to Customs Inspection and Permit," Customs Form 7512. For purposes of Form 7512, this order shall certify to Customs that the articles are being reexported because they may not be sold in the United States. Claimant shall furnish a copy of the signed Form 7512 to the FDA. Claimant shall also provide to FDA a copy

of Shipper's Export Declaration, Commerce Form 7525;

(9) Claimant shall reexport the articles within 90 days of the filing of the bond;

(10) At all times after release by this court, until the time the articles are consigned to the steamship line for reexportation, claimant shall retain the imported articles intact for examination or inspection by authorized FDA and/or Customs representatives, and shall maintain the records or other proof necessary to establish the identity of the released articles;

(11) Claimant shall obtain a foreign landing certificate or other written proof of receipt by Chemtraco B.V. of the articles and shall supply same to the FDA. Claimant shall use its best efforts to obtain such documentation issued or acknowledged by an agency of the government of the Netherlands that reflects the delivery of the articles in the Netherlands and shall provide FDA with written documentation of its efforts;

(12) Claimant shall state to Chemtraco in writing that the drugs are not to be re-sold, directly or indirectly, to customers in the United States. And it is further

ORDERED, ADJUDGED AND DECREED that

(13) claimant shall not sell or offer for sale in domestic commerce the articles of drug or any part thereof, or otherwise dispose of the articles in a manner contrary to the provisions of the Federal Food, Drug, and Cosmetic Act;

(14) Claimant shall not reimport, or participate in any way in the reimportation of, the drugs into the United States;

(15) Claimant shall compensate the United States of America for the costs of supervision at the rate of $37.00 per hour per FDA representative for each day actually employed in the supervision of the exportation process; and, seventy-five dollars ($75.00) per day per person for subsistence expenses, where necessary. Claimant also shall compensate the United States of America for necessary traveling expenses, including mileage at the rate of $.205 per mile, and for any other necessary expenses which may be incurred in connection with the supervisory responsibilities of the FDA; and

(16) Claimant's President, Heinz G. Dall, who has consented to the jurisdiction of this Court over his person for purposes of this Order, shall not divert the articles of drug from delivery to Chemtraco, B.V. in Rotterdam, Netherlands; shall not sell or offer for sale in domestic commerce the articles of drug or any part thereof, and shall not reimport, or participate in any way in the reimportation of, the articles of drug into the United States;

(17) Upon notice to the United States attorney for this district, claimant shall present a motion to the Court for discharge of the bond given in this proceding, attaching to its motion copies of all the documents and forms required by this Order, and if the Court finds that the conditions of the bond have been satisfied, the clerk will be directed to cancel and discharge the bond given in this proceding.

ORDERED, ADJUDGED, AND DECREED, that if claimant does not avail itself of the opportunity to export the condemned articles in the manner aforesaid, the United States Marshals shall retain custody of the articles pending the issuance of an order by this Court regarding their disposition.

This court expressly retains jurisdiction to issue such further decrees and orders as may be necessary to the proper disposition of the action. Should the claimant fail to abide by and perform all terms and conditions of this Order, or of such further Order as may be entered in this action, then on motion of the United States of America in this proceeding, the bond shall be forfeited and judgment entered thereon.

## On Motion for Stay of Execution

This matter is now before the court on the Government's motion for a stay of execution, pending appeal, of this court's February 28, 1986 opinion and order granting the motion of defendant-claimant Amex-

chem International, Inc. ("Amexchem") for reexportation, in lieu of destruction, of certain safe and effective drugs that have been condemned for technical reasons by agreement. For the reasons set forth below, the court denies the Government's motion for a stay of execution of that order.

## I. Facts and Procedural History

The facts and procedural history of this case prior to the February 28, 1986 opinion and order are set out, in great detail, in that order, and will not be repeated here. However, an accurate description of this court's February 28, 1986 opinion and the attached agreed order of reexportation is necessary before the court specifically addresses the points raised by the Government in its motion for a stay. Such a description is necessary, given the Government's mischaracterization of the court's February 28, 1986 opinion in its Memorandum in Support of its Motion for Stay ("Memorandum").[1]

After outlining the facts and procedural history of this case in detail, this court, in its February 28, 1986 opinion, examined the statutory requirements for reexportation of the condemned drugs. Opinion *supra* 452–53. Those requirements, found in sections 304(d)(1) and 801(d)(1) of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 334(d)(1), 381(d)(1), are as follows:

1. The adulteration or misbranding of the articles, or any other violation, did not occur after the articles were imported, § 304(d)(1)(A);

2. The person or firm seeking to reexport the articles had no cause for believing that the articles were adulterated, misbranded or in violation before they were released from Customs custody, § 304(d)(1)(B);

3. The articles are labeled on the outside of the shipping package that they are intended for export, § 801(d)(1)(C); and

4. The articles are not sold or offered for sale in domestic commerce, § 801(d)(1)(D).

The court acknowledged that Amexchem had the burden of pleading and proving satisfaction of these requirements. Opinion *supra* 452–53. The court also acknowledged that satisfaction of the requirements does not mandate an order of reexportation; rather, section 304 of the FDCA leaves reexportation relief within the discretion of the court. Opinion *supra* 453.

The court then went on to find that Amexchem met its burden of pleading and proving satisfaction of the statutory requirements, and, in its discretion, granted Amexchem's motion for reexportation in lieu of destruction. Specifically, the court found that the adulteration or misbranding

---

1. The Government's mischaracterization is evidenced in its interpretation, on pages 4–5 of its Memorandum, of the alleged effect of this court's February 28, 1986 ruling. According to the Government:

    This court has ruled, in effect, that an importer has little or no obligation to determine from reliable sources whether particular drugs can legally be sold in this country before he imports them; that he can continue to import illegal drugs after receiving specific notice from the Food and Drug Administration (FDA) that his activities are illegal; that he can keep the drugs in this country for a year or more after he learns that they are illegal, and even attempt to sell the drugs on the domestic market after learning of their illegality; and that he can then reexport the drugs with impunity after FDA discovers the illegal products and has them seized.

    The court's ruling sets no such precedent. Instead, the court's ruling merely holds that, for purposes of this case, the FDA is required to enact all substantive rules of general applicability as valid rules or regulations, in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Beyond that, the ruling merely states, in effect, that courts, in their discretion in the appropriate case, may allow importers, able to plead and prove the statutory requirements for reexportation of condemned drugs, to reexport such drugs in lieu of destruction. In this case, the drugs were safe and effective animal drugs in general use that were manufactured by reputable American and European drug companies, but they were condemned because of foreign approved labeling, concentrations, or directions for use that have not been approved in the United States. The drugs remain in their unopened original containers.

of the drugs, or any other violation, did not occur after the articles were imported because: (1) all of the drugs in all twelve shipments subject to this action remain unopened and unaltered in their original containers; and (2) under section 502 of the FDCA, 21 U.S.C. § 352(f)(1), shipment of a drug already condemned as misbranded does not constitute a separate, new "misbranding." Opinion *supra* 553–54.

The court also found that Amexchem had no reason to believe that any of the drug shipments were in violation prior to their release from Customs custody. The court found that the purported "policy" of the Food and Drug Administration ("FDA"), requiring importers of oxytetracycline to have a firm order prior to importation and to present to the FDA matching letters evidencing the firm order, is in fact a substantive rule of general applicability. Therefore, the FDA's failure to comply with the notice and comment requirement of section 553 of the APA and the publication requirement of the FOIA renders the "policy" void and unenforceable against Amexchem. Opinion *supra* 454–60. Also, according to the court, the facts demonstrate that Amexchem did not have actual knowledge that the flavomycin 200 shipment was in violation prior to Customs release. Opinion *supra* 460–61. In addition, the court found that Amexchem did not "constructively know" that the flavomycin 4% shipments were in violation because, even though 4% is not listed as an approved concentration in the regulations, 21 C.F.R. § 558.95, at least one firm, American Hoechst, was authorized to purchase flavomycin 4% at that time. The court noted the FDA's reliance on its "policy" that an importer must have a firm order from an authorized purchaser prior to importation, and, should an importer discover that its intended purchaser is not authorized, it may not then sell the drugs to an authorized purchaser. The court found this policy to be in violation of the APA and the FOIA and unenforceable as against Amexchem. Opinion *supra* 461. Finally, according to the court, Amexchem did not "constructively know" that the elancoban 20%

shipment was in violation prior to release from Customs custody, because Amexchem had ordered elancoban 10%, an approved concentration, 21 C.F.R. § 355. Amexchem had no reason to know that its foreign supplier, Chemtraco, had erroneously shipped elancoban 20%. Opinion *supra* 461.

The court found the last two requirements to be prospective in nature. Opinion *supra* 461–62. The court set a bond in the amount of $50,000, in the agreed reexportation order accompanying its opinion, in order to ensure compliance with these provisions. Moreover, the court required the principal officer of the claimant, Heinz Dall, to submit himself to the jurisdiction of the court and be bound by the terms of the reexportation order.

The final pages of the court's opinion detail the factors the court considered in its exercise of discretion. The court rejected the Government's characterization of Amexchem as an importer scheming to evade the FDCA and FDA regulations, and noted that, in any event, a finding of "mala fides" on the part of Amexchem does not prohibit an order of reexportation. Opinion *supra* 461–64. Ultimately, based on all of the evidence presented in the lengthy court hearing, the court granted Amexchem's motion for reexportation of the perfectly safe, unused drugs to Europe, where they could be used.

## II. Requirements For a Stay Pending Appeal

In ruling on the Government's request for a stay, this court must consider (1) whether the Government has demonstrated a substantial likelihood of success on the merits on appeal; (2) whether the Government has shown a likelihood of irreparable injury absent a stay; (3) whether a stay would substantially harm Amexchem; and (4) where the public interest lies. *Glick v. Koenig*, 766 F.2d 265, 269 (7th Cir.1985) (citing *Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir.1973)). The court finds that the Government has failed to demonstrate either a likelihood of success on appeal or irreparable injury absent

a stay, that Amexchem will suffer substantial harm absent a stay, and that the public interest will not be disserved by allowing the reexportation to proceed in this case. The court therefore denies the Government's motion for a stay pending appeal.

### A. Substantial Likelihood of Success on the Merits

In its Memorandum, the Government puts forward various "legal issues" which allegedly demonstrate the Government's likelihood of success on appeal. The court now addresses each legal issue.

1. **Legal Issue 1: "Whether a drug importer has an obligation to ascertain from official or other reliable sources if a particular drug can legally be sold in the United States before he imports it."**

Again, this "legal issue" demonstrates the Government's fundamental misunderstanding or mischaracterization of the court's ruling.[2] The court did not rule that an importer need not ascertain, from publicly available sources, whether a drug can legally be sold in the United States. As the facts found by this court overwhelmingly demonstrate, all of the drugs Amexchem *ordered*, not all of the drugs Chemtraco shipped, could be legally sold to some authorized purchaser in the United States.

2. **Legal Issue 2: "Whether an importer has 'cause to believe' that a product is violative before entry when he learns before the drug arrives in the United States that his only intended customer is not permitted to use the drug."**

In order to hold that Amexchem had "cause to believe" that the flavomycin 200 shipment was violative before entry because it discovered that its only intended customer, Lane Agri, was not permitted to use flavomycin 4%, the court would have to condone an underlying FDA "policy" which was not enacted or published pursuant to the APA and the FOIA, as required. This "policy" is a substantive, generally applicable requirement that an importer have a firm order from an authorized purchaser prior to ordering and importing a drug, and a prohibition on any attempt to secure an authorized purchaser, should an importer discover that its intended purchaser lacks authorization. This policy cannot be found in any publicly available document, and it was not uniformly followed by the FDA. Yet the Government would have the court find that Amexchem had "cause to believe" that the flavomycin was in violation, and that the drugs therefore must be destroyed, due to this policy. As other courts have refused enforcement of policies in violation of the APA and the FOIA, so this

---

**2.** The Government's discussion of this "legal issue" is riddled with inaccuracies. On page 13 of its Memorandum, the Government states: "Certain of the drugs imported by Amexchem (Flavomycin and Elancoban) are not described in the regulations. Amexchem therefore had 'cause to believe' that the drugs were illegal when they entered the United States."' Flavomycin and elancoban are indeed described in the regulations. Flavomycin is described under 21 C.F.R. § 558.95, which covers bambermycins. Flavomycin is within the class of drugs referred to as bambermycins. *Handbook of Veterinary Drugs* 368 (ed. Irving S. Rossoff 1974). Also, testimony at the hearing on Amexchem's motion for reexportation established that elancoban is the tradename for monensin, which is described in 21 C.F.R. § 558.355. Granted, flavomycin 4% and elancoban 20% are not listed as approved concentrations in 21 C.F.R. §§ 558.95 and 558.355, respectively. However, credible testimony at the hearing established that at least one firm was authorized to purchase flavomy-

cin 4% during the time Amexchem imported the flavomycin, and Amexchem ordered elancoban 10%, an approved concentration, not elancoban 20%.

In note 17 on page 13, the Government states that "[t]he court holds that it is sufficient for an importer to 'assume' that he is ordering a legal product ... or to show through mathematical manipulations that he must have intended to order a legal product." The court did not so hold. With regard to the elancoban, the court found Heinz Dall's testimony that he ordered elancoban 10% to be highly credible and corroborated by evidence regarding Amexchem's standard discount and the price Amexchem offered Lane Agri for the elancoban. Opinion *supra* 451–52. With regard to the flavomycin, the court found that evidence of Amexchem's standard discount and offered price corroborated Dall's credible testimony that Lane Agri never specified flavomycin 2.2% when it ordered the flavomycin. Opinion *supra* 450–51.

court refuses to enforce this policy against Amexchem by destroying rather than reexporting these drugs.[3] Opinion *supra* 454–60, 461.

3. **Legal Issue 3: "Whether a drug importer has 'cause to believe' that a drug is violative when it appears on an import alert list that provides for automatic administrative detention when the drug arrives, unless the importer identifies the NADA under which the drug is to be used, especially where the importer has experienced routine detentions of the same drug in the past."**

■ The court has exhaustively addressed this argument in its opinion, *supra* 454 n. 20, 458 n. 27. However, for emphasis, the court again points out that the Import Alerts *do not* state the firm order/matching letter policy. Even if the Import Alerts did include the matching letter policy, they are not publicly available documents. An importer should not be held to have constructive knowledge of an unwritten requirement that is not published publicly.

4. **Legal Issue 4: "Whether the bulk oxytetracycline was misbranded (a) because it failed to meet the requirement for exemption from the statutory 'adequate directions for use' requirement ... that the shipment of drugs be covered by an approved NADA, or (b) for some other reason."**

The Government once again contends that Amexchem had reason to know that the drugs were in violation prior to release from Customs custody because Amexchem did not have a firm order for the OTC from V.P.O. prior to importation. The court squarely and completely addressed this argument in its opinion, *supra* 454–60. The regulation which the Government for the

first time cites as stating the firm order policy, 21 C.F.R. § 201.122, is inapposite. That regulation merely states the conditions for exemption from labeling requirements; it does not embody the firm order/matching letter policy. The regulation is wholly irrelevant to this case, because Amexchem has not claimed that it is exempt from any labeling requirement.

5. **Legal Issue 5: "Whether an agency is required to utilize notice-and-comment rulemaking when it decides how it will exercise its prosecutorial discretion."**

The Government contends that the FDA's practice of allowing some importers without firm orders prior to importation to find authorized purchasers is an exercise of prosecutorial discretion to which the APA and FOIA requirements do not apply. A fundamental flaw in the Government's contention is that it assumes the existence of a firm order requirement in the first place. It is this substantive, generally applicable requirement that the court held inapplicable to Amexchem, because of the FDA's failure to enact or publish it as required by the APA and the FOIA. Moreover, the evidence shows that this so-called policy is not consistently followed in at least the Port of New York. This inconsistent application clearly is not the result of any so-called prosecutorial discretion.

6. **Legal Issue 6: "Whether a drug can be misbranded by an act, e.g., by shipment to a party who is not authorized to receive it."**

As pointed out in the discussion under "legal issue 4," the Government erroneously views 21 C.F.R. § 201.122 as stating the firm order/matching letter policy. Moreover, the Government also asserts that this same regulation makes the shipment of a drug in the United States a separate, dis-

3. Before leaving this "legal issue" the court notes that there is no basis for the Government's assertion in note 18, page 13, that Dall was not aware that American Hoechst was authorized to purchase flavomycin 4% until trial. Dall's testimony at the hearing demonstrates that he knew of American Hoechst's practice long before the

hearing. Dall testified that, when Lane Agri informed him in July, 1983 that it was not authorized to blend flavomycin 4%, he also learned from Lane Agri that American Hoechst had such authorization, and Dall requested Lane Agri try to secure similar authorization.

tinct act of misbranding. Again, this regulation outlines conditions on exemption from labeling requirements; it does not define or set out any such act as a separate act of misbranding. That the FDA might have the authority to promulgate a regulation making the shipment of a drug to an unauthorized purchaser a separate violation is irrelevant; the FDA has failed to lawfully promulgate any such regulation.

### 7. Legal Issue 7: "Whether the actual safety of the drugs is relevant."

■ The safety of the drugs is relevant to this court's exercise of discretion under § 304 of the FDCA which governs the reexportation of condemned drugs *from the United States.* The drugs subject to seizure in this case may be technically "per se illegal" in the United States, but they are in fact safe, saleable and usable in Europe.

In recognizing the safety of the drugs, and considering safety in its exercise of discretion, the court is not "turning the animal drug regulatory system upside down," as the Government contends. The court only considered the safety of the drugs after first finding that Amexchem had met, or will meet, the statutory requirements for reexportation. The court did not hold that importers may keep and use safe, albeit violative, drugs in the United States, nor did the court hold that an importer may reexport safe drugs even if it

fails to meet the requirements for reexportation.

### 8. Legal Issue 8: "Whether the basis for the discretion exercised by this court is consistent with congressional objectives."

■ The Government contends that this court's exercise of discretion under section 304 of the FDCA in its February 28, 1986 opinion conflicts with the congressional purpose behind section 801. Section 801, however, governs drugs that are refused entry into the United States. Once Customs releases articles of drugs into the United States, they become subject to section 304; section 801 no longer governs. *See 230 Boxes of Fish v. United States,* 168 F.2d 361, 364 (6th Cir.1948).

■ In conclusion, the court finds that the Government's "legal issues" fail to demonstrate that the Government is likely to succeed on the merits on appeal.[4] Moreover, although the Government contends on page 4 of its Memorandum that the "need to assess witness credibility is not a factor that will weigh against the United States' prevailing on appeal," the court's evaluation of the credibility of the witnesses weighed heavily in its finding that Amexchem met the reexportation requirements and in the court's exercise of its discretion. On appeal, substantial deference should be given to the trial judge who observed the demeanor of all the witnesses

---

**4.** The Government contends that it need only show "a substantial case on the merits," as the balance of equities weighs heavily in its favor, relying on *Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d 841 (D.C.Cir.1977) and *Ruiz v. Estelle,* 650 F.2d 555 (5th Cir.1981), *later proceeding,* 666 F.2d 854 (5th Cir.1982), *aff'd, vacated, modified and dismissed in part,* 679 F.2d 1115 (5th Cir.1982), *amended, vacated and rehearing denied in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). The court notes first that the Fifth Circuit placed the following limits on its initial ruling in *Ruiz* that a "substantial case on the merits" satisfies the probability of success on the merits requirement:

Likelihood of success remains a prerequisite in the usual case even if it is not an invariable requirement. Only "if the balance of the equities (i.e. consideration of the other three

factors) is ... *heavily tilted* in the movant's favor" will we issue a stay in its absence and, even then, the issue must be one with patent substantial merit.

*Ruiz,* 666 F.2d at 856–57 (*citing Ruiz I,* 650 F.2d at 565–66) (emphasis in original).

Also, the Seventh Circuit made no indication in *Glick,* 766 F.2d 265, or in any other case dealing with the requirements for a stay pending appeal, that it has adopted this alternative policy. However, in *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir. 1984), a preliminary injunction case, the Seventh Circuit cited *Washington* with approval and found the "substantial likelihood of success" requirement for preliminary injunction and stay pending appeal to be "analogous." Regardless, the court finds that the Government has failed to satisfy either standard. The balance of equities weighs heavily in favor of the claimant in this case.

during the lengthy hearing in this proceeding. *United States v. Friedman,* 739 F.2d 252, 255 (7th Cir.1984).

### B. Irreparable Injury To The United States

■ The Government contends that it will be irreparably harmed if this court denies its motion for a stay, because it will not be able to obtain the specific ultimate relief it seeks—destruction of the drugs— and because reexportation may possibly moot its appeal. Although reexportation of the drugs to Europe under court order will preclude destruction of the drugs, it is difficult to fathom how removal of the drugs from the United States will "irreparably injure" the Government. The purpose behind the FDCA, to rid the channels of commerce in the United States of impure and adulterated products, is clearly satisfied by removal of the goods from the United States. Moreover, the court has found that the drugs are not impure or unsafe, only technically subject to condemnation.

■ As for the Government's contention that reexportation will render its appeal moot, even if this court accepted this contention as true, it remains that the Government has failed to demonstrate a likelihood of success on the merits on appeal. The court could, on that basis, deny the Government's motion for a stay, even if the Government were able to show it would suffer irreparable harm absent a stay. *American Cetacean Society v. Baldridge,* 604 F.Supp. 1411, 1414 (D.D.C.1985), *aff'd,* 768 F.2d 426 (D.C.Cir.1985), *cert. granted sub nom. Japan Whaling Association v. American Cetacean Society,* —— U.S. ——, 106 S.Ct. 787, 88 L.Ed.2d 766 (1986). However, the reexportation of the articles of drugs in this case will not render the appeal moot. *See United States v. An Article of Drug ... Neoterramycin, Etc.,* 529 F.Supp. 230, 232–35 (N.D.Tex.1981), *aff'd sub nom., United States v. An Article of Drug Consisting of 4,680 Pails,* 725 F.2d 976, 982–84 (5th Cir.1984).[5]

### C. Harm to Amexchem

■ The Government contends that harm to Amexchem is not a relevant consideration. Harm to Amexchem might not be relevant if the issue were whether Amexchem violated the FDCA. However, the issue is whether the court should stay its February 28, 1986 order in which the court found that Amexchem satisfied or will satisfy the statutory requirements for reexportation and allowed Amexchem to reexport certain drugs before they are destroyed by the long passage of time in this proceeding. The fact that drugs are involved does not automatically render harm to the importer irrelevant. As stated above, there is no danger here that the purposes underlying the FDCA will be subverted if reexportation proceeds.

■ Amexchem will suffer irreparable harm should this court stay execution of its order. While Amexchem did not produce evidence of specific expiration dates at the court's hearing, there was testimony that the drugs were rapidly losing their potency. The court so found. Moreover, the court can no doubt take judicial notice of this, especially since the FDA's own regulations requiring expiration dating recognize that antibiotics lose potency over time. *See* 21 C.F.R. §§ 211.-137, 431.20.

In an affidavit attached to Amexchem's Memorandum in Opposition to the United

---

**5.** As in *4,680 Pails,* this court is presented with an "interface of in rem and in personam jurisdiction." *4,680 Pails,* 725 F.2d at 983. Amexchem, the claimant, appeared in this in rem condemnation action, entered into a consent decree of condemnation, and requested permission to reexport the drugs in lieu of destruction. Amexchem did not file a limited appearance. Also, as in *4,680 Pails,* although this action in form concerns the destruction or reexportation of certain lots of drugs, the substance of the case, and the effect of this court's decision, extend far beyond the twelve lots of drugs. The issue throughout these proceedings has been whether the FDA was and is required to promulgate and publish certain policies as rule and regulations, in accordance with the APA and the FOIA. Reexportation of the drugs will not affect the possibility of the continuing consideration of this issue before the Court of Appeals.

States' Motion for Stay, Dall states that, if the court were to grant a stay, Amexchem would additionally lose approximately $18,-000 per month because of loss of value, interest and storage costs.[6] This substantial additional loss which will result from a stay is likely to destroy Amexchem's business. The court notes that the Government has not offered or agreed to reimburse the claimant for the substantial additional losses claimant will suffer if a stay is granted and the Government is not successful in blocking reexportation by its appeal.

### D. Public Interest

The Government contends that a stay is in the public interest, because this court's February 28, 1986 opinion "will have a decidedly detrimental effect on [the FDA's] ability to control the importation of illegal animal drugs." There is no support for such a claim. The fact that the FDA may have to comply with the law will not prevent the FDA from lawfully performing its duties concerning the importation of animal drugs. The court's decision merely requires the FDA to comply with the APA and the FOIA when establishing substantive, generally applicable "policies."

As the Government points out, the FDA has taken several steps to curb the illegal importation of new animal drugs. Oddly enough, however, the FDA has failed to lawfully promulgate the requirements relied upon in this action, as required under the APA and the FOIA. Promulgation and publication of these requirements would greatly aid importers desiring to legally import drugs into the United States. *See United States v. Hayes*, 325 F.2d 307, 309 (4th Cir.1963). Such importation is clearly in the public interest, because added competition in this area will reduce prices while increasing quality to United States consumers.

In support of its contention that stay of this court's decision will serve the public interest, the Government sets out alleged "undisputed facts [which] show how congressional and agency objectives would be stymied if Amexchem's actions were sanctioned." Again, the Government's mischaracterization of the court's decision is apparent. The court did not "sanction" Amexchem's actions; rather, the court found that, under the facts and law applicable to this case, these animal drugs, which are considered safe and reliable in Europe may be reexported in lieu of wasteful destruction.

As for the so-called "undisputed facts" claimed by the FDA, first, Edward Ballitch's May, 1983 letter to Dall merely states that "foreign manufactured products cannot be *sold* in the United States without an approved new drug application." Government Exhibit 1204 (emphasis added). The letter does not state that the products cannot be imported into the United States without a firm offer or a presentation of matching letters. Moreover, for every one of the drugs involved in this case—*as ordered*—there was at least one authorized purchaser in the United States; therefore, every one of the drugs—as ordered—could have been legally sold in the United States.

Second, although the drugs were in the United States from six to eighteen months prior to seizure, nine of the twelve shipments were sent directly to storage. Only two of the twelve shipments were ever removed from storage, and then only in an effort to "recondition" the shipments under FDA supervision. All twelve of the shipments were sitting unopened in warehouses when the Government seized the drugs. They remain in their original containers. *See supra* 463–64.

Third, there is no legal requirement that an importer seek permission to reexport violative drugs that have been released into

---

6. Amexchem has already lost a very substantial amount of money as a result of this proceeding. This has placed the company in serious financial jeopardy. *See* Dall's Affidavit attached to Claimant's Memorandum in Opposition to the United States' Motion For Stay as well as Dall's

testimony at the hearing. The great amount of money Amexchem has lost due to these lengthy proceedings will surely discourage, rather than encourage, importers from bringing United States violative products.

the United States within a certain time period. Also, while Dall may not have sought Government approval for reexportation, he did, during this period, seek FDA approval of his plan to "recondition" some of the drugs. In fact, Dall waited over a month for a final decision from the FDA on his "reconditioning" plan. Opinion *supra* 448, 449. Dall always stated that no action could be taken with respect to any drugs without FDA approval.

Finally, Amexchem did not sell the terramycin 167 and tylosin shipments for domestic use. Rather, Amexchem proposed to sell both of those shipments, subject to the FDA's approval of Dall's "reconditioning" plan. When the FDA rejected Dall's plan at the July 16, 1984 meeting in Rockville, Maryland, Dall immediately had the terramycin removed from IMS to storage, and the tylosin removed from International Nutrition to storage. Opinion, *supra* 448, 449.

■ The public interest will not be disserved if this court denies the stay and allows the reexportation to proceed. Reexportation amply serves the interest in protecting the American public from unapproved drugs. The FDA's desire to utilize destruction as a punitive, rather than protective, measure does not serve the public interest and has no basis in law. The drugs involved are safe, pure, and lawfully saleable in Europe. The claimant has already suffered serious financial loss as a result of this proceeding. Entry of a stay may destroy claimant as well as the useful drugs.

### III.  Conclusion

The court finds that the Government has not met the requirements for a stay pending appeal. Therefore, the court denies the Government's motion for a stay, so that the reexportation of these perfectly safe, unopened, unused drugs may proceed before they are destroyed by the passage of time of these lengthy proceedings.[7]

7.  The court has attached to this opinion the two previous opinions it issued in this case, as Ex-